**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Augustine Chikadili OKAYFOR (92–1706), and Tim Okosi (92–1812),
Defendants–Appellants.**

Nos. 92–1706, 92–1812.

United States Court of Appeals,
Sixth Circuit.

Argued April 26, 1993.

Decided May 14, 1993 *.

* This decision was originally issued as an "unpublished decision" filed on May 14, 1993. On June 7, 1993, the court designated the opinion as one recommended for full-text publication.

J. Michael Buckley (argued and briefed), Office of the U.S. Atty., Detroit, MI, for the U.S. plaintiff-appellee.

Kenneth R. Sasse (argued and briefed), Detroit, MI, for Augustine Chikadili Okayfor, defendant-appellant.

James C. Thomas (briefed), Detroit, MI, for Tim Okosi, defendant-appellant.

Before: GUY and NELSON, Circuit Judges; and WELLFORD, Senior Circuit Judge.

PER CURIAM.

Defendants Augustine (Gus) Okayfor and Tim Okosi appeal their sentences for conspiracy to unlawfully import heroin into the United States, in violation of 21 U.S.C. §§ 952, 960, and 963. Okayfor also appeals his conviction, arguing that evidence of his possession of $15,000 in cash and a counterfeit alien registration card was unfairly prejudicial. Okayfor and Okosi object to the inclusion of 3.5 kilograms of heroin in sentencing calculations, arguing that no evidence was offered linking them to all of the heroin. Okayfor and Okosi also challenge the addition of three points to their base offense level for being managers or supervisors under U.S.S.G. § 3B1.1(b). We uphold Okayfor's conviction and the addition of three points to both Okayfor's and Okosi's base offense level for being managers, but remand for further findings regarding the proper quantity of heroin to be attributed to each of them for purposes of sentencing.

## I.

Okayfor, Okosi, and six other defendants were charged with conspiracy to unlawfully import heroin into the United States. The indictment charged that the conspiracy lasted from approximately January 1991 through June 6, 1991, and indicated that the head of the importation ring was Gus Okayfor's brother, John Innocent Okayfor, a/k/a Jeff Anderson. John Okayfor was described as having organized the smuggling operation, including recruiting couriers, obtaining air-

line tickets, and providing money for expenses. The only evidence linking Gus Okayfor and Tim Okosi to the conspiracy came from the testimony of Gail McKoy, a co-conspirator and drug courier who was arrested on June 6, 1991.

McKoy testified that on January 29, 1991, she made her first importation trip. This first trip was coordinated and financed by John Okayfor. John arranged to have his brother, Gus, pick up McKoy who was living in Decatur, Georgia, and drive her to the airport in Atlanta. Upon arriving at the airport, Gus Okayfor paid cash for McKoy's flight to New York and also gave McKoy $300 for spending money. From New York, McKoy flew to Antwerp, Belgium, where she stayed for four or five days until she was given a package of heroin by two men. She returned to the United States on February 4 with an unspecified amount of heroin and was paid $5,000 for her trip.

A little over three weeks later, defendant Gus Okayfor was arrested by INS inspectors at the international airport in San Juan, Puerto Rico. Okayfor had $15,024 in United States currency hidden in a belt and shirt, a counterfeit temporary resident alien card, a credit card in the name of "John Okayfor," a Sprint phone card in the name of "Jeffrey Anderson," and a California driver's license issued to Augustine Okayfor. Okayfor arrived in Puerto Rico at 2:00 a.m. and was scheduled to return to New York at 7:00 a.m. the same day. Okayfor told the officials that he lived in Decatur, Georgia, but his return flight was to New York and his driver's license was from California.

In March 1991, John Okayfor set up another importation trip for Gail McKoy. This trip coincided with the trip of several other couriers. Kim Coleman, Larinda Whiters, and Catreda Edwards were recruited to go on a trip to Singapore and bring back drugs to the United States. John Okayfor arranged for these couriers to stay at various hotels in New York and Connecticut, paid for their plane tickets, and paid for Coleman's passport. On March 21, these three couriers flew from New York to Singapore. During this same time period, McKoy was flown from Atlanta to New York on a ticket paid for by John Okayfor. Upon arrival in New York, McKoy was introduced to another courier, Tamie Pinkston. John Okayfor paid for McKoy's passport and booked McKoy's airline ticket to Singapore through "Bill Tours," a travel agency in New York. McKoy and Pinkston flew to Singapore on March 20.

Once in Singapore, McKoy and Pinkston met up with Kim Coleman. Photos were introduced placing the three, together, in Singapore. Several days later, Coleman, Whiters, and Edwards were given packages of heroin and instructed how to conceal them. Coleman was to fly into Detroit via Tokyo, while Whiters and Edwards were to return later following the same route. Upon Coleman's arrival in Detroit on March 29, she was arrested by U.S. Customs agents. She had in her possession over one kilogram of heroin. She agreed to cooperate with authorities and named the other couriers, including McKoy, and advised the agents of their route. Authorities in Japan were contacted and Whiters and Edwards were arrested in Tokyo. At the time of their arrest, Whiters and Edwards were each in possession of under a kilogram of heroin. Together they possessed almost 1.5 kilograms. Gail McKoy learned of Coleman's arrest while still in Singapore, changed her itinerary, and on April 9 flew back to Atlanta via Amsterdam without any heroin. McKoy never directly spoke with John Okayfor again.

The following month, defendant Gus Okayfor contacted McKoy to see if she was interested in making another trip. McKoy requested to be paid double what she was paid for her first importation trip and requested that she travel alone. Although Gus Okayfor denied still working for his brother, he could not immediately agree to her conditions. He later called back and said he had the authority to meet her demands. McKoy flew from Atlanta to New York with a ticket that Gus Okayfor told her would be prepaid. Once in New York, she met Gus Okayfor and defendant Tim Okosi. Okosi drove the three of them to a Quality Inn near La Guardia Airport and gave McKoy money for a three-day stay. Okosi also gave McKoy two telephone numbers where he could be reached. McKoy

later used one of those numbers to contact Okosi. Okosi instructed McKoy to get a visa for the African country of Cameroon and gave her an airline ticket to Washington, D.C., for that purpose.

After McKoy obtained the visa and returned to New York, Okosi gave her an airline ticket to Cameroon and $500 in cash. She was instructed to go sightseeing in Cameroon and wait until they contacted her. While in Cameroon, Okosi met McKoy and paid her hotel bill. After giving her some more cash, he told McKoy that he had to go to Nigeria. When Okosi returned, he gave McKoy a package of heroin to be carried to the United States. She was told that when she arrived in the United States she should go to her hotel and wait for someone to meet her. She arrived in New York on June 5, 1991, and was arrested. At the time of her arrest, she had in her possession just over one kilogram of heroin. McKoy agreed to cooperate with customs agents.

After the indictment was handed down, Gus Okayfor was arrested in Hartford, Connecticut. At the time of his arrest, his wallet contained a business card for Bill Tours travel agency in New York with the telephone number for the Quality Inn near La Guardia Airport written on the back. Tim Okosi was arrested in West Haven, Connecticut.

After a jury trial at which Okosi testified, both Okayfor and Okosi were found guilty. The government argued, and the district court agreed, that the conspiracy involved approximately 3.5 kilograms of heroin—one kilogram brought into New York by McKoy, one kilogram brought into Detroit by Coleman, and 1.5 kilograms in the possession of Whiters and Edwards in Tokyo. The court did not consider the amount brought into New York on McKoy's first importation trip. The court assigned both defendants a base offense level of 34. The district court also found that both defendants played managerial or supervisory roles in the conspiracy and thus added three additional points to the base offense level. The district court over-

ruled both defendants' objections to the inclusion of the total 3.5 kilograms of heroin and the three-point addition for being managers. Okayfor also challenged the presentence report placing him in criminal history category II. The district court sustained Okayfor's criminal history score objection and placed Okayfor in criminal history category I, which, combined with an offense level of 37, produced a sentencing range of 210–262 months. Okayfor was sentenced to 235 months' imprisonment and five years' supervised release. Okosi, whose sentencing range was the same, was sentenced to 230 months' imprisonment and five years' supervised release.

## II.

■ Defendant Okayfor argues that the evidence introduced at trial concerning the events that occurred in Puerto Rico on February 28, 1991, was irrelevant and prejudicial evidence of another criminal act. The district court ruled that evidence of Okayfor's possession of the money and counterfeit resident alien card was admissible, but that Okayfor's misdemeanor conviction for possession of the card was inadmissible unless Okayfor testified. Defendant argues that under Federal Rule of Evidence 404(b) this evidence should not have been admitted. Rule 404(b) generally prohibits the introduction of testimony regarding other criminal acts "unless that evidence bears upon a relevant issue in the case such as motive, opportunity or knowledge." *United States v. Loehr,* 966 F.2d 201, 204 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992). "[E]vidence of a criminal defendant's prior misconduct is inadmissible in the prosecution's case in chief to show the accused's bad character or criminal propensity." *United States v. Ring,* 513 F.2d 1001, 1004 (6th Cir.1975).

The government's response to defendant's argument is two-fold. First, the government argues that the evidence concerning defendant's illegal activities [1] in Puerto Rico is not

---

1. 18 U.S.C. § 1546 proscribes the knowing use or possession of a forged or counterfeit alien registration card and defines the crime as a misdemeanor. 31 U.S.C. § 5316 provides that a person transporting monetary instruments of more than $10,000 to or from the United States at one time shall file a report with U.S. Customs. 31 U.S.C. § 5322 provides the criminal penalties

evidence of past misconduct or a prior crime, it is evidence of overt acts in furtherance of the heroin importation conspiracy. The government's main contention in this regard is that the events in Puerto Rico occurred during the time frame of the conspiracy. The government argues that the events in Puerto Rico occurred three weeks after McCoy returned from her first heroin importation trip and that the money in Okayfor's possession was relevant evidence of unexplained wealth after the commission of a crime, especially when he informed agents that he was employed cleaning offices. *See United States v. O'Neal,* 496 F.2d 368, 370–71 (6th Cir.1974). Okayfor's possession of the counterfeit alien registration card was relevant evidence concerning Okayfor's consciousness of guilt—he was seeking to conceal his travel. The card had Augustine Okayfor's name and picture on it, but the serial number was registered to a Mexican woman. The use of a counterfeit resident alien card is analogous to evidence of use of an alias. *See United States v. Stowell,* 947 F.2d 1251, 1255 (5th Cir.1991) (use of an alias is relevant as proof of consciousness of guilt), *cert. denied,* —— U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 497 (1992).

The government's second argument is that even if Rule 404(b) is applicable, it would not preclude the introduction of this evidence. In order for evidence to be admissible under Rule 404(b), it must be established that: (1) the evidence is relevant for a purpose other than to show character or criminal propensity; and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under Rule 403. *Huddleston v. United States,* 485 U.S. 681, 686, 691, 108 S.Ct. 1496, 1499, 1502, 99 L.Ed.2d 771 (1988).

We agree that the evidence of Okayfor's possession of a large sum of money and a counterfeit alien registration card were relevant for the reasons advanced by the government. We also find the prejudicial effect of that evidence, if any, was outweighed by its probative value. The district court enjoys broad discretion relative to the admissibility of evidence pursuant to Rule 404(b). *United*

*States v. Ebens,* 800 F.2d 1422, 1433 (6th Cir.1986). We find that the district court did not abuse its discretion in admitting this evidence. Additionally, even if the district court had abused its discretion, we would find the admission of this evidence to be harmless error. *See United States v. Reed,* 647 F.2d 678, 687 (6th Cir.) (evidence violative of Rule 404(b) did not adversely affect the substantial rights of the defendants to a fair trial), *cert. denied,* 454 U.S. 837, 102 S.Ct. 142, 70 L.Ed.2d 118 (1981).

### III.

Pursuant to U.S.S.G. § 2D1.1(c)(5), the guideline provision applicable when the offense involves more than three but less than ten kilograms of heroin, both defendants' base offense level was set at 34. Both defendants appeal the calculation of their base offense level, arguing they were neither aware of the total 3.5 kilograms of heroin nor was this total amount reasonably foreseeable.

A district court's factual findings regarding the amount of narcotics for which a defendant is to be held accountable are accepted by this court unless clearly erroneous. *United States v. Walton,* 908 F.2d 1289, 1300–01 (6th Cir.), *cert. denied,* 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). For sentencing purposes, the amount of drugs involved in a crime need only be proved by a preponderance of the evidence. *United States v. Moreno,* 899 F.2d 465, 473 (6th Cir.1990). However, a defendant is chargeable for the drug transactions of other members of the conspiracy only if they were known to him or were reasonably foreseeable to him. *See United States v. Sims,* 975 F.2d 1225, 1243–44 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *United States v. Hodges,* 935 F.2d 766, 774 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 251, 116 L.Ed.2d 206 (1991). "Therefore, because 'the scope of conduct for which a defendant can be held accountable under the sentencing guidelines is significantly narrower than the conduct embraced by the law of conspiracy,' a sentencing judge

---

for failure to so report. While these acts were criminal, no government witness explicitly testi-

fied that Okayfor even was arrested, let alone convicted.

may not, without further findings, simply sentence a defendant according to the amount of narcotics involved in the conspiracy." *United States v. Lanni,* 970 F.2d 1092, 1093 (2d Cir.1992) (quoting *United States v. Perrone,* 936 F.2d 1403, 1416 (2d Cir.1991)).

■ Under the guidelines in effect at the time of defendants' sentencing, a defendant's base offense level is determined on the basis of all acts "for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1) (1991). The commentary further clarifies that, in the case of a conspiracy,

the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

U.S.S.G. § 1B1.3, comment. (n. 1) (1991). A further amendment to this section meant to clarify and fully illustrate the operation of the guideline, U.S.S.G.App.C, Amend. 439, states that "the scope of the criminal activity jointly undertaken by the defendant ... is not necessarily the same as the scope of the entire conspiracy...." U.S.S.G. § 1B1.3, comment. (n. 2) (1992). "In order to determine *the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement)." Id.* While

this amendment was not effective when Okayfor and Okosi were sentenced, it is instructive as to the proper interpretation to be given to the 1991 version of U.S.S.G. § 1B1.3(a)(1). *See United States v. French,* 974 F.2d 687, 699 (6th Cir.1992) (using subsequent amendments to the guidelines to assist interpretation), *cert. denied,* —— U.S. ——, 113 S.Ct. 1012, 122 L.Ed.2d 160 (1993).

■ At the sentencing hearing, counsel for Okayfor objected to the inclusion of 3.5 kilograms to determine his base offense level on the grounds that there was no evidence that Okayfor was aware of, or reasonably should have been aware of, that quantity. After the government responded "that Mr. Okayfor is responsible criminally for the entire amount of heroin involved in the conspiracy," the court denied the objection, stating: "I agree with the government on that ... There is case law on that, where it's a conspiracy, a defendant is chargeable with the entire amount that's introduced by the government." In response to Okosi's similar arguments, the district judge stated: "The law is clear on that. He gets charged, anybody involved in a conspiracy [is] charged with the amount."

The record shows that the district court did not address, implicitly or explicitly, the scope of the criminal activity each defendant agreed to jointly undertake. The record only shows that the judge charged the criminal defendants before him, Okayfor and Okosi,[2] with accountability for the entire conspiracy. Therefore, on this point only, we must remand for further proceedings. We emphasize we are only remanding for factual findings regarding the amount of heroin to be included in calculating the base offense level using the proper inquiry. The district court may come to the conclusion that the entire amount was reasonably foreseeable to either or both of the defendants, but the record must reflect such determination. Given the fact that no evidence was offered of Okosi's involvement in the conspiracy prior to May 1991, the district court should explicitly set forth the evidence on which it relies if it finds

2. The other defendants charged were either at large, incarcerated, or had struck deals with the government in return for their cooperation.

Okosi accountable for the entire 3.5 kilograms.

## IV.

 The final argument raised by defendants in their appeals concerns the three-point addition to their base offense level for being managers or supervisors pursuant to U.S.S.G. § 3B1.1(b). Defendants argue they were minor participants and should have been given a reduction in offense level under U.S.S.G. § 3B1.2. As we recently have held, "[t]he district court's determination as to role in an offense is a finding that is 'heavily dependent on the facts,' and the defendant has the burden of proving such mitigating factors by a preponderance of the evidence." *United States v. Sims*, 975 F.2d at 1242 (citation omitted). The district court was not required to cite specific facts to support its findings regarding defendants' roles in the conspiracy because it presided over the trial. *United States v. Richardson*, 949 F.2d 851, 859 (6th Cir.1991).

A district court's determination regarding a defendant's role in the offense is reversible only if clearly erroneous. *United States v. Sims*, 975 F.2d at 1242. We do not find the district court's determinations as to the roles Okayfor or Okosi played in this conspiracy to be clearly erroneous.

## V.

Augustine Okayfor's conviction is **AF-FIRMED.** Okayfor's and Okosi's sentences are **VACATED** and **REMANDED** to the district court for **RESENTENCING** in conformity with this opinion.

**OHIO STATE UNIVERSITY, d/b/a Ohio State Hospitals, Plaintiff–Appellee,**

v.

**SECRETARY, UNITED STATES DE-PARTMENT OF HEALTH AND HU-MAN SERVICES, Defendant–Appellant.**

No. 92–3045.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1992.

Decided June 8, 1993.

Rehearing and Rehearing En Banc Denied Aug. 4, 1993.

123

Catherine M. Ballard (argued and briefed), Diane Marie Signoracci, Bricker & Eckler, Columbus, OH, for plaintiff-appellee.

Anthony J. Steinmeyer, Robert D. Kamenshine (argued and briefed), Robert V. Zenar (briefed), U.S. Dept. of Justice, Appellate Staff, Civil Div., Washington, DC, Joseph E. Kane, Asst. U.S. Atty., Columbus, OH, for defendant-appellant.

Before: MARTIN and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.

BOYCE F. MARTIN, Jr., Circuit Judge.

The Ohio State University operates a 905–bed acute-care teaching hospital in Columbus, Ohio in conjunction with its medical school. The hospital, administered by the Ohio State's medical school, trains recently graduated doctors, called interns and residents, by having them provide patient care. When Medicare was instituted, the federal government began reimbursing the hospital for medical care provided to patients by these doctors. In 1985, the hospital claimed reimbursement from Medicare in the amount of $765,000 for indirect costs only, which were the overhead costs of its graduate medical program for the provision of patient services. Included in that total was the cost of space, salaries, utilities, supplies, etc. which were related to patient services.

A Medicare intermediary, an entity hired by the Department of Health and Human Services to review cost-reimbursement applications, rejected the hospital's request for reimbursement of indirect costs. Another entity, the Provider Reimbursement Review Board, reversed this decision. Another review followed, and the Deputy Administrator of the Health Care Financing Administration of the Department of Health and Human Services reversed the Review Board's decision, agreeing with the intermediary. Review of the Deputy Administrator's denial of reimbursement was made to the federal district court. The district court granted summary judgment for the hospital, concluding that it was entitled to reimbursement of its costs related to patient care under Medicare. 777 F.Supp. 582. We agree with the district court and affirm.

A resolution of the question before us turns on the interpretation of 42 C.F.R. § 413.85. We are thus again sent into the sea of murky precedents to divine our power to overturn an agency's interpretation of its own regulations.[1] As we read *Whiteside v.*

---

1. Quite frankly, the degree to which courts are bound by agency interpretations of law has been like quicksand. The standard has been constantly shifting, steadily sinking, and, from the perspective of the intermediate appellate courts, frustrating. At first, agency interpretations of law were to be reviewed *de novo. Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) ("... interpretations and opinions of the Administrator ... while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment....") However, we have been told to give "some deference" to the interpretation of the agency. *FTC v. Indiana Fed. of Dentists,* 476 U.S. 447, 454, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986) ("The legal issues presented ... are ... for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agen-cy's interpretation].").  And we have been told that we are not to follow an agency's interpretation if the agency's interpretation violates the specific language of the law. *Demarest v. Manspeaker,* 498 U.S. 184, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991) ("But administrative interpretation of a statute contrary to language as plain as we find here is not entitled to deference."). Finally, we have been told that we are not to overturn an agency's interpretation of law if the agency's interpretation is "reasonable." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., et al.,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984) (Intermediate court is to determine whether agency's view "is a reasonable one."); *Whiteside v. Secretary of Health & Human Svcs.,* 834 F.2d 1289, 1292 (6th Cir.1987) (The question for the court is "whether the Secretary's interpretation is reasonable, consistent, and persuasive.")

*Secretary of Health & Human Svcs.*, 834 F.2d 1289, 1292 (6th Cir.1987), we are bound by an agency's interpretation of its own regulations unless its interpretation is not "reasonable, consistent, and persuasive." In this case, the Secretary's interpretation of 42 C.F.R. § 413.85 is neither reasonable nor persuasive.

■ As we read the statute, 42 U.S.C. § 1395hh, the Medicare program is designed to reimburse certain reasonable and necessary medical expenses. Educational activities, according to 42 C.F.R. § 413.85, are reimbursable as reasonable and necessary medical expenses if they are: 1) approved programs; 2) contribute to the quality of patient care within a hospital which receives Medicare; and 3) do not redistribute costs from educational institutions to patient care institutions. This issue was resolved precisely in *University of Cincinnati v. Bowen*, 875 F.2d 1207, 1210 (6th Cir.1989). In the present case, as in the *University of Cincinnati* case, the graduate medical program was accredited and contributed to patient care in the university-run hospital. The Deputy Administrator in this case, however, determined that the Hospital's request for reimbursement for certain overhead expenses constituted an unlawful redistribution of costs from the graduate program to the hospital.

In our opinion, the Deputy Administrator's decision was based on an unreasonable and unpersuasive interpretation of 42 C.F.R. § 413.85(c). That regulation provides,

> Although the intent of the program is to share in the support of educational activities customarily or traditionally carried on by providers in conjunction with their operations, it is not intended that this program should participate in increased costs resulting from redistribution of costs from educational institutions or units to patient care institutions or units.

As we noted in *Whiteside*, 834 F.2d at 1292, an agency's interpretation of the law binds this court when the interpretation is "reasonable, consistent, and persuasive." Of course, no court has stated how to determine which interpretations of a statute are "reasonable, consistent, and persuasive" and which are not. So, after all these years of debate and after much judicial ink has been spilled, we are back to essentially the

The request for reimbursement for indirect costs, known as overhead expenses outside of government, of its graduate medical program does not constitute a redistribution of costs from the medical program to the hospital. The Department interprets the "redistribution" clause of 42 C.F.R. § 413.85 to mean that costs for patient care, at one time paid by educational institutions but subsequently paid by hospitals, are not reimbursable. The Department's interpretation is neither reasonable nor persuasive because it does not comport with the language of 42 C.F.R. § 413.85(c). The language "educational activities customarily or traditionally carried on by providers in conjunction with their operations" indicates redistribution of kinds of costs, not a temporal redistribution of educational costs. The redistribution clause, therefore, applies to a redistribution of costs from an educational program, such as classroom expenses, to a provider of Medicare medical services. The graduate medical program here does not involve classroom-type expenses, but involves expenses of doctors who are furthering their training by providing medical services. As the district court noted, in finding for Ohio State University,

> [T]he plain meaning of [42 C.F.R. § 413.85(c)] is to authorize reimbursement of all direct and indirect costs related to the kinds of educational activities customarily or traditionally carried on by providers, but to deny reimbursement for costs related to educational activities which are customarily or traditionally carried on by educational institutions, such as medical and nursing schools. The court concludes that the underlying purpose of the redistribution principle is to limit reimbursement to educational costs related to patient care and to deny reimbursement for educational costs unrelated to patient care.

old rule that courts are not bound by agency interpretations of law and that courts are to apply laws based on the court's interpretation of the law's reasonable meaning. This entire process, travelling far without going anywhere, could have been avoided if the executive branch were left to enforce the law and the judicial branch were left to interpret the law.

Contrary to the Secretary's interpretation, the district court's interpretation of 42 C.F.R. § 413.85(c) is certainly reasonable and persuasive.

The costs claimed by the hospital are not a redistribution of educational costs unrelated to patient care. They are a cost of providing patient care and are reimbursable under 42 U.S.C. § 1395hh and 42 C.F.R. § 413.85(g), which allow recovery of costs of providers of medical services relating to patient care.

The judgment of the district court is affirmed.

BOGGS, J., concurs in the result only.

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sherman SHARPE, Defendant–Appellant.**

No. 92–1984.

United States Court of Appeals,
Sixth Circuit.

Argued May 4, 1993.

Decided June 11, 1993.

**126**

Lynn A. Helland (argued and briefed), Office of the U.S. Atty., Detroit, MI, for plaintiff-appellee.

Kevin S. Ernst (argued and briefed), Davis, Culpepper & Saroki, Detroit, MI, for defendant-appellant.

Before: KENNEDY and SILER, Circuit Judges; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Attorney Sherman Sharpe appeals his multiple-count conviction under 18 U.S.C. § 645. We affirm the district court's July 28, 1992 judgment for the following reasons.

## I.

Defendant-appellant Sherman Sharpe ("Sharpe" or "appellant") was a practicing attorney who, in 1986, was admitted to the panel of Chapter 7 bankruptcy trustees for the Eastern District of Michigan. About the time Sharpe began accepting cases, he met with Marion Mack ("Mack"), the Assistant United States Trustee for the Eastern District of Michigan. Mack told Sharpe that bankruptcy practice required a serious commitment and could not be taken lightly, and warned Sharpe not to "mess with the money" of any bankruptcy estate.

In December 1986, Sharpe was appointed trustee for the estate of Jim's Garage, a restaurant in downtown Detroit. The estate had about $200,000 in cash assets when Sharpe was appointed trustee. On April 14, 1987, the United States Trustee wrote Sharpe a letter informing him that he had not filed the first interim report for the estate of Jim's Garage. Sharpe subsequently filed the report.

On November 16, 1987, approximately seven months after filing the first report, the United States Trustee ordered that Sharpe show cause for not filing the second interim report in the estate of Jim's Garage. Sharpe filed the second interim report on December 1, 1987.

Beginning on December 18, 1987, Sharpe began to issue checks to himself that were drawn on the savings and checking accounts of the Jim's Garage estate. Sharpe made 12 such withdrawals totalling approximately $80,000 over the next 16 months. None of the withdrawals were used to pay for expenses incurred in administering the estate.

In 1988, the United States Trustee filed a motion to remove Sharpe as trustee from his appointment in the estate of Domeby Metal Products for not properly noticing a sale. If the motion was successful, Sharpe could have been removed from all of his bankruptcy trusteeships. On August 4, 1988, Sharpe entered into a voluntary probation agreement whereby Sharpe agreed to file the necessary interim reports in all of his cases.

In June 1989, the United States Trustee informed Sharpe that if he did not file his past-due interim reports, the Jim's Garage estate would be removed from his control. Less than three weeks later, Sharpe repaid $80,000 to the bankruptcy estate and provided certain limited records to the United States Trustee in connection with the Jim's Garage estate including photocopies of ledger sheets which omitted all of the savings and

checking account withdrawals that he had issued to himself.

On August 16, 1989, Sharpe sent an interim report regarding the Jim's Garage estate to the United States Trustee. The report listed the transactions of the estate, including the $80,000 deposit on July 14, 1989, but did not list to whom disbursements were made or from whom receipts were received. After the United States Trustee questioned Sharpe regarding the suspicious disbursements, Sharpe deposited an additional $14,138.59 to the bankruptcy estate on August 18, 1989, purportedly representing interest on the money that Sharpe claimed he had invested.

On December 19, 1991, the grand jury indicted Sharpe for twelve offenses arising out of his administration of the Jim's Garage bankruptcy estate. Specifically, Sharpe was charged with 12 counts of "embezzlement" under 18 U.S.C. § 153, 12 counts of "conversion" under 18 U.S.C. § 645, and one false statement count under 18 U.S.C. § 1001.

18 U.S.C. § 153 provides:

Whoever knowingly and fraudulently appropriates to his own use, embezzles, spends, or transfers any property or secretes or destroys any document belonging to the estate of a debtor which came into his charge as trustee, custodian, marshal, or other officer of the court, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

*Id.* 18 U.S.C. § 645 provides:

Whoever, being a United States marshal, clerk, receiver, referee, trustee, or other officer of a United States court, or any deputy, assistant, or employee of any such officer, retains or converts to his own use or to the use of another or after demand by the party entitled thereto, unlawfully retains any money coming into his hands by virtue of his official relation, position or employment, is guilty of embezzlement and shall, where the offense is not otherwise punishable by enactment of Congress, be fined not more than double the value of the money so embezzled or imprisoned not more than ten years, or both; but if the amount embezzled does not exceed $100, he shall be fined not more than $1,000 or

imprisoned not more than one year, or both.

It shall not be a defense that the accused person had any interest in such moneys or fund.

*Id.*

Sharpe's trial commenced on March 31, 1992. Sharpe presented witnesses, but did not testify on his own behalf. His attorney argued to the jury that Sharpe had invested the estate's money under the mistaken belief that bankruptcy law authorized him to do so. On April 7, 1992, the district court judge directed a verdict with respect to the twelve counts under 18 U.S.C. § 153 because the government had not established fraud. The jury subsequently returned a guilty verdict on all twelve counts under 18 U.S.C. § 645, but acquitted Sharpe of the single count under 18 U.S.C. § 1001. On July 28, 1992, the district court judge sentenced Sharpe to twelve months in prison on each of the twelve counts (to run concurrently), to be followed by a three-year term of supervised release.

Sharpe filed a timely notice of appeal on August 7, 1992. On August 20, 1992, the district court judge issued an order staying Sharpe's sentence pending appeal.

## II.

### *Whether 18 U.S.C. § 645 Requires Proof of Fraud*

The evidence reveals that, after being warned not to tamper with the money in the bankruptcy estates that he administered, Sharpe appropriated approximately $80,000 from the Jim's Garage estate. Sharpe deposited most of this money into his personal and business checking accounts. Sharpe kept no records of the money he took from the estate, and did not disclose his taking to the United States Trustee on the interim financial reports he prepared.

Though Sharpe concedes that a bankruptcy trustee is an officer of the court, Sharpe maintains that section 645 requires more than a wrongful conversion. Specifically, Sharpe claims that the crime requires fraudulent intent because the term "embezzlement" implies that Congress intended to incorporate the common law definition of em-

bezzlement into section 645. Because the district court did not find fraud under section 153, Sharpe contends that his section 645 convictions must be reversed.

■ The structure of section 645 reveals that Congress defined "embezzlement" within the section rather than by incorporating any common law definition of "embezzlement." The statute states that a court officer who retains or converts certain property to his own use is guilty of embezzlement. Had Congress intended to incorporate some other definition of embezzlement, it would not have defined the term within the section.

Sharpe also contends that the district court erred by employing jury instructions "which did not require the prosecution to prove beyond a reasonable doubt that any conversion was done fraudulently." Appellant's Brief at 26–27. The jury instructions provided (in relevant part):

Counts 2, 4, 6, 8, 10, 12, 14, 16, 19, 21, 23 and 25 of the indictment charge that on various dates the Defendant, who was then a trustee and officer of the court in the bankruptcy estate of Jim's Garage, knowingly converted to his own use or to the use of another, various amounts of money that came into his possession by virtue of his official position.

The United States law says that whoever, being a trustee or other officer of the United States Court, converts to his own use or to the use of another, money coming into his hands by virtue of his official position, is guilty of embezzlement.

The Government must prove the elements beyond a reasonable doubt. First, that the Defendant was a trustee or other officer of the United States Court.

Two, that the money came into his hands by virtue of his official position. And three, that the Defendant converted any part of this money to his own use or to the use of another without lawful authority.

I instruct you that a person appointed to be a trustee for a bankruptcy estate is an officer of the court. You've heard evidence that the Defendant returned money that he withdrew from the bankruptcy estate of Jim's Garage.

If you find that Defendant used money from this bankruptcy estate for his own purposes, and that he did not reasonably believe in good faith that he was properly authorized by law to do so, it is not a defense that he might later have paid the money back. This is so even if he meant to pay the money back all along. The crime in this case is completed.

. . . .

If, on the other hand, you find that the Defendant acted under a good faith belief, even though mistaken that he had authority under Section 345 of the bankruptcy code to act as he did, you must find the Defendant not guilty.

The Defendant argues that he believed that he was authorized by the bankruptcy law to use the money of the Jim's Garage estate for his own purposes. If Defendant had a reasonable belief that his actions were authorized by law at the time of any particular taking of money that is charged in the indictment, even though Defendant may have been mistaken in his belief, then you must find him not guilty of the counts that relate to that particular transaction.

[E]vidence that the Defendant acted as he did because he was ignorant of the law may be considered by you in determining whether he acted knowingly or fraudulently.

However, if, after considering all of the evidence, you find beyond a reasonable doubt that the Defendant knew that he could not use the money in the bankruptcy estate for his own purposes, the re-payment and intent to repay a loan are not a defense to any of the charges in the indictment.

Joint Appendix at 266–69.

■ These instructions clearly conveyed to the jury that Sharpe should be found guilty of violating section 645 if he deliberately took financial advantage of his confidential relationship with the estate. Sharpe did not object to these jury instructions in district court. In fact, the instructions that the jury received were jointly submitted by the government and the appellant. "[N]ot even the plain error doctrine permits reversal on the

ground that the trial court granted a defendant's request to charge." *United States v. Young,* 745 F.2d 733, 752 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). *See also United States v. Thurman,* 417 F.2d 752, 753 (D.C.Cir.1969) ("Appellant not only failed to raise any objection to the court's charge, but it is clear that his retained trial counsel specifically requested and urged the trial court to give the instruction now objected to. In such circumstances we decline to find error, plain or otherwise."), *cert. denied,* 397 U.S. 1026, 90 S.Ct. 1269, 25 L.Ed.2d 535 (1970).

Because the evidence reveals that Sharpe appropriated the bankruptcy estate's money for personal benefit in violation of his authority as trustee, and because Sharpe cannot demonstrate that the district court's jury instructions constituted plain error, we reject Sharpe's first assignment of error.

### Whether 18 U.S.C. § 153 Precludes 18 U.S.C. § 645's Applicability

Sharpe persuaded the district court to dismiss the section 153 counts by maintaining that 18 U.S.C. § 153 requires that the government prove fraud. Now that the jury has convicted him under section 645, Sharpe maintains that 18 U.S.C. § 153 governs his conduct and precludes section 645's applicability due to section 645's exclusivity provision. We disagree.

Sharpe invited the error that he now alleges. Specifically, the district court dismissed the section 153 charges because the government failed to demonstrate that Sharpe had accomplished the taking through fraudulent means.

■ "The doctrine of 'invited error' refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit." *Harvis v. Roadway Express, Inc.,* 923 F.2d 59, 60 (6th Cir.1991) (citation omitted). *See also United States v. Schaff,* 948 F.2d 501, 506 (9th Cir.1991) ("Under the invited-error doctrine, an error that is caused by the actions of the complaining party will cause reversal 'only in the most exceptional situation.'") (citations omitted);

*United States v. Baytank, Inc.,* 934 F.2d 599, 606–07 (5th Cir.1991) ("Baytank, however, not only failed to object to the allegedly overbroad portion of the court's charge, but that portion of the charge is the precise language requested by Baytank. A party generally may not invite error and then complain thereof. This Court has made clear that the invited error doctrine applies to jury instructions as well as evidentiary rulings.") (citations omitted).

■ Sharpe caused the district court to dismiss the section 153 counts by persuading the court that section 153 requires proof of fraud. Having accomplished that, Sharpe now argues that section 153 governs his conduct, and that section 645, by its terms, does not. Pursuant to the invited-error doctrine, we reject Sharpe's claim.

■ Though the invited-error doctrine precludes Sharpe's claim, we note that the principle is well-settled that, when two criminal statutes apply to the same conduct, the government may choose the statute under which it will proceed unless Congress has clearly intended that one supplant the other. *United States v. Oldfield,* 859 F.2d 392, 398 (6th Cir.1988). There is no such clear intention in 18 U.S.C. § 645.

Though 18 U.S.C. § 645 provides that a violator "shall, where the offense is not otherwise punishable by enactment of Congress," be exposed to certain penalties, it is significant that this provision is contained in the penalty portion of the statute, not in the portion that defines the offense. Had Congress intended to render section 645 inapplicable if another statute applied, it could have done so simply by placing the relevant clause before the words "is guilty of embezzlement." The fact that Congress put this clause in the punishment section indicates its intent that section 645 not create disparate punishments for conduct covered by other statutes.

■ Though Sharpe invokes the "rule of lenity" in support of his interpretation of section 645, the rule of lenity applies only if doubt exists about a statute's scope after resorting to all other methods of statutory construction. *Moskal v. United States,* 498 U.S. 103, 111 S.Ct. 461, 112 L.Ed.2d 449

(1990). Because Congress did not clearly express its intent to supplant 18 U.S.C. § 645, we need not invoke the "rule of lenity."

Because Sharpe invited the error that he now complains of, and because section 153 does not preclude section 645's applicability, we reject Sharpe's second assignment of error.

### Double Jeopardy

On appeal, Sharpe maintains that the double jeopardy clause of the Fifth Amendment precluded the jury's consideration of section 645 once the district court determined that the government had failed to prove fraud under section 153.

■ The double jeopardy clause protects three interests: avoiding a second prosecution for the same offense following acquittal; avoiding a second prosecution for the same offense following a conviction; and, avoiding multiple punishments for the same offense. *United States v. Barrett,* 933 F.2d 355, 360 (6th Cir.1991). We do not have a situation of multiple punishments because the section 153 charges were dismissed, and the protection against multiple prosecutions is not implicated when a defendant faces multiple charges in a single proceeding. *Id.*

■ The district court dismissed the section 153 charges after finding that the government had failed to prove fraud. Because 18 U.S.C. § 645 does not require proof of fraud, the district court did not violate the double jeopardy clause by submitting the section 645 counts to the jury. We therefore reject Sharpe's third assignment of error.

### III.

We AFFIRM the district court's July 28, 1992 judgment for the aforementioned reasons.

The YOUGHIOGHENY & OHIO COAL COMPANY, Petitioner,

v.

Wayne N. McANGUES and Director, Office of Workers' Compensation Programs, United States Department of Labor, Respondents.

No. 92–3765.

United States Court of Appeals, Sixth Circuit.

Argued May 4, 1993.

Decided June 15, 1993.

John G. Paleudis (argued and briefed), Hanlon, Duff & Paleudis, St. Clairsville, OH, for petitioner.

Edmund A. Sargus, Jr. (argued and briefed), Burech & Associates, St. Clairsville, OH, and Donald S. Shire, Assoc. Sol., Christian P. Barber (argued and briefed) and J. Matthew McCracken, U.S. Dept. of Labor, Office of the Sol., Washington, DC, for respondents.

Before: MILBURN; RYAN, and NORRIS, Circuit Judges.

RYAN, Circuit Judge.

The Youghiogheny & Ohio Coal Company appeals from the decision awarding benefits to claimant Wayne McAngues under the Black Lung Benefits Act, 30 U.S.C. §§ 901 *et seq.* Y & O contends that it rebutted the regulatory interim presumption of total coal-related pulmonary disability when it showed that McAngues suffered disabling non-respiratory injuries in an automobile accident. We affirm, however, because substantial evidence supports a finding of total coal-related pulmonary disability, and because we conclude that an employer's demonstration of a separate, non-respiratory disabling condition is irrelevant to a rebuttal of the presumption.

## I.

Wayne McAngues had worked as an underground coal miner for Y & O for eleven years when he was involved in an automobile accident on May 4, 1976, in which he sustained serious head injuries. After being comatose for two weeks, McAngues recuperated to the point where today, he retains some disturbance of his balance and equilibrium, as well as possible brain damage which causes hemiparesis, or muscular weakness, on the right side of his body. After the accident, McAngues never worked again as a coal miner.

McAngues first applied for black lung benefits in April 1978. He was twice awarded benefits by the ALJ only to have his case remanded by the Benefits Review Board.[1] In 1990, however, the ALJ issued a second supplemental decision and order on second remand, again awarding McAngues benefits, and this award was affirmed by the Board. It is from that decision that Y & O appeals.

---

[1]. In the ALJ's first decision, he invoked, based on chest x-ray evidence, a regulatory "interim presumption" of total disability due to pneumoconiosis, and also concluded that the employer's evidence failed to rebut that presumption. The Board vacated and remanded for further consideration of whether rebuttal was established. The ALJ then relied on the opinion of the claimant's expert, crediting his findings over that of the employer's expert, and again concluded that rebuttal was not established. The Board remanded again, this time because it found the ALJ had not provided an adequate rationale for discrediting the opinion of the employer's expert, and because the ALJ had not discussed McAngues's car accident.