35 F.3d 567
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Carl BRYAN (93-1583); Balentine Torres (93-1584); Edward
Plaskewicz (93-1590); Bonnie Jean Torres (93-1694) Lisa
Santoyo (93-1706); Michael Manuel Santoyo (93-1748); Keith
Plaskewicz (93-1749); Yolanda Reyes (93-1750); and Michael
Carrillo (93-1798), Defendants-Appellants.
 Nos. 93-1583, 93-1584, 93-1590, 93-1694, 93-1706, 93-1748 to
93-1750, 93-1798.
 United States Court of Appeals, Sixth Circuit.
 Aug. 29, 1994.
 
 Before: BOGGS and SILER, Circuit Judges; and HOLSCHUH, Chief District Judge.*
 PER CURIAM.
 
 
 1
 Defendants-appellants appeal their convictions and sentences arising out of a cocaine conspiracy lasting from October 1991 to September 1992, raising various trial and sentencing errors. With the exception of the conviction of Balentine Torres on Count Five, we affirm the convictions and sentences, for the reasons discussed herein.
 
 
 2
 * Defendants were tried before a jury on a sixteen-count Second Superseding Indictment. Count One charged all nine defendants with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) and 846. Counts Two, Three, and Four charged defendants Balentine Torres and Bonnie Jean Torres (husband and wife) with distribution of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. Counts Five, Eight, and Nine charged both Torreses and Carl Bryan (Bonnie Torres's brother) with distribution of cocaine. Counts Six and Seven charged Bonnie Torres and Bryan with distribution of cocaine. Count Ten charged Michael Manuel Santoyo (a.k.a. Mackey Santoya) and Keith and Edward Plaskewicz (brothers) with distribution of cocaine. Count Eleven charged Balentine Torres with distribution of cocaine. Count Twelve charged Michael Santoyo and the Torreses with distribution of cocaine. Count Thirteen charged Balentine Torres and Bryan with distribution of cocaine. Count Fourteen charged Michael Santoyo and Yolanda Reyes (Michael Santoyo's live-in girlfriend) with distribution of cocaine. Count Fifteen charged Lisa Santoyo (Michael Santoyo's daughter) and Michael Carrillo (Lisa Santoyo's live-in boyfriend) with possession with intent to distribute cocaine. Count Sixteen charged the Torreses with possession of cocaine with intent to distribute.
 
 
 3
 The jury convicted all defendants on all counts, with the following exceptions: Lisa Santoyo and Carrillo were acquitted of the conspiracy count, as the jury was unable to reach a verdict on that count against those two defendants; Keith Plaskewicz pleaded guilty to the possession with intent to distribute count and the conspiracy charge against him was dismissed; Count Three was dismissed as to Balentine Torres; and Count Nine was dismissed as to both Torreses.
 
 
 4
 The defendants were sentenced as follows: Balentine Torres, 145 months' imprisonment on all counts, to run concurrently; Bryan, 121 months' imprisonment on all counts, to run concurrently; Edward Plaskewicz, 24 months' imprisonment on all counts, to run concurrently; Bonnie Torres, 240 months' imprisonment on the conspiracy count and 151 months' on the remaining counts, all to run concurrently; Lisa Santoyo, 24 months' imprisonment; Michael Santoyo, life imprisonment on the conspiracy count and 360 months' on the remaining counts, all to run concurrently; Keith Plaskewicz, 18 months' imprisonment; Yolanda Reyes, 235 months' imprisonment on all counts, to run concurrently; and Carrillo, 27 months' imprisonment. Also, various fines and terms of supervised release were imposed on each defendant.
 
 
 5
 Defendants appeal to this court.
 
 II
 
 6
 Evidence at trial consisted of the testimony of four informants and one undercover officer, all of whom participated in controlled buys from various of the defendants, and drugs and drug paraphernalia obtained from the execution of search warrants at the Torreses' house and at Lisa Santoyo's and Carrillo's house in Saginaw, Michigan. In brief, Michael Santoyo and Reyes brought cocaine into Saginaw. Some of it was stored, measured, and packaged at the Carrillo-Santoyo house. Michael Santoyo and Reyes distributed the cocaine to others, including the Torreses and Plaskewiczes. The Torreses and Bryan sold cocaine from the Torreses' house.
 
 
 7
 Informant Norman Wilson testified that he had known the Torreses for several years before October 1991, had been a drug user, and had purchased, and seen others purchase, cocaine from the Torreses in summer 1991. Wilson testified that on October 17, 1991, he gave money to Bonnie Torres for cocaine ($40), and Balentine gave him the cocaine (a half gram); this was a controlled buy. Wilson testified that Balentine told him to come back if he needed more. (This transaction constituted the basis for Count Two.)
 
 
 8
 On October 21, Wilson returned to the Torres residence with an undercover officer, Dennis McMahan, who remained in the car. Wilson again bought cocaine from Bonnie ($40 for a half gram). Bonnie told him that more would be available if he needed it because "two kilos" were "coming in" from "old man Jackson." (Count Three.)
 
 
 9
 The next day, October 22, Wilson went to the Torres residence and talked to Bonnie about getting more cocaine; she told him to return in the evening. Later, Wilson returned with McMahan in the car. Bonnie and Reyes were leaving as he approached. Inside, Wilson bought more cocaine from Balentine ($20 for a quarter gram). Balentine offered to sell him more, and Wilson said that he would return for larger quantities later. (Count Four.)
 
 
 10
 On October 30, Wilson went to the Torres residence and talked to Bonnie about getting some cocaine. Wilson told her that he would return later with a friend to get the cocaine, and she said that there would be someone there to take care of it. When Wilson and McMahan returned in the evening, they were met by Bryan, who told them that Bonnie did not want to meet McMahan, and McMahan returned to his car. Wilson later bought cocaine from Bryan ($60 for three quarters of a gram). (Count Five.)
 
 
 11
 Informant Christine Rulapaugh (Wilson's girlfriend) testified that she had been a drug user and had bought cocaine from the Torreses before she began working with law enforcement authorities. Rulapaugh testified that on October 31, she and McMahan went to the Torres residence. Rulapaugh went inside and asked Bonnie for some cocaine, telling Bonnie that it was for McMahan in the car and that he would not give her the money without seeing the cocaine (apparently, this was an attempt to get McMahan inside the house). Bonnie gave the cocaine to Bryan, who gave it to Rulapaugh; Rulapaugh took it to the car, while Bryan watched. McMahan gave $125 to Rulapaugh, who gave it to Bryan. (Count Six.)
 
 
 12
 Wilson testified that on November 12, he and McMahan returned to the Torres house. Both went into the house. Bryan asked what they wanted, and Wilson told him that they were looking for cocaine. Bryan and Bonnie went into the bedroom; Bryan returned with cocaine, which he gave to Wilson for cash ($40 for a half gram). Wilson gave the cocaine to McMahan and they left. (Count Seven.)
 
 
 13
 On December 2, Wilson and McMahan went to the Torres house. Bryan asked what they wanted, and they told him that they were looking for cocaine. Bryan asked Wilson for the money, but Wilson told him that he was dealing with Bonnie, and he gave the money to Bonnie. Bonnie said that she would have to check with Balentine to see how much cocaine they had. After disappearing into the utility room for a short spell, she returned, followed by Balentine. Balentine or Bonnie (the record is not clear about which one) said that he (or she) would sell them cocaine ($80 for about a gram). Balentine said that it would take a minute to prepare, and Wilson and McMahan were asked to leave for awhile. They gave the money to Bonnie and left. When they returned, Balentine gave the cocaine to Wilson, who gave it to McMahan. McMahan "talked to Bal about maybe hooking up later in the week for some more[, and] he said sure." (Count Eight.)
 
 
 14
 On January 7, 1992, Wilson and McMahan returned yet again to the Torres residence. Wilson went in and was met by Bryan. Wilson asked where the Torreses were, and Bryan said that they were in bed sick. Wilson asked Bryan for some cocaine, and Bryan sold half a gram to Wilson for $40. (Count Nine.)
 
 
 15
 Informant David Nichols testified that before working with the authorities, he had been a drug user and had bought cocaine from the Plaskewiczes, the Torreses, Michael Santoyo, and Reyes. On February 11, Nichols and McMahan went to the Plaskewiczes' residence and met with Edward. Edward asked McMahan what he wanted, and McMahan said that he was looking for some cocaine. Edward told him to drive to a place on Bond Street; Edward went to a residence (of someone not charged in this case) while Nichols and McMahan waited in the car. Edward returned and said that that person was out of cocaine. He directed McMahan to drive to the "old man's" house on Washington Street--Michael Santoyo's house. Edward took the money ($120) from McMahan and went into the Santoyo house by himself. He returned to the car and said that Santoyo was concerned because he did not know McMahan and that Santoyo had called Keith to discuss the transaction. He said that, after talking to Keith, Santoyo was willing to sell the cocaine, but that they were to return to the Plaskewicz residence, where Santoyo would deliver it (a "16th"). At the Plaskewicz residence, Edward questioned McMahan in an effort to determine if he was a police officer; Keith did the same with Nichols. Shortly thereafter, Santoyo arrived in Reyes's car. Keith told McMahan and Nichols that they could not leave the house until the car had left; he then told them to meet him at a nearby bar for the delivery of the cocaine. McMahan and Nichols complied, and at the bar, Nichols gave the money to Keith and got the cocaine from him. (Count Ten.)
 
 
 16
 On April 1, Rulapaugh and McMahan returned to the Torres house. Rulapaugh went inside and asked Balentine if she could buy some cocaine. Shortly thereafter, Reyes arrived in her car. Balentine took Rulapaugh into one room, and Bonnie took Reyes into another. After exchanging cash ($80) for cocaine with Balentine, Rulapaugh returned to the car and gave the cocaine to McMahan. Rulapaugh spoke with Bonnie on the phone later in the day, and said that Bonnie referred to Reyes as her "connect" (supplier) and that Reyes had been to the house earlier to drop off cocaine but, suspecting that police officers were in the area, warned Bonnie to flush the cocaine in case there were a raid. (Count Eleven.)
 
 
 17
 On May 19, Wilson and McMahan went to the Torres house to buy cocaine. When they went in, they saw Santoyo and Reyes. McMahan was asked to wait at the door, and he did. Wilson asked Bonnie for a half ounce of cocaine, and she said that it would not be available until later. Balentine offered to sell a smaller quantity that he had. Wilson bought that cocaine. During the exchange of cash for drugs ($250 for an "8-ball"), Balentine said that the cocaine had come from the people at the table--Santoyo and Reyes, who were at that time counting out money (specifically, Wilson saw a three-inch stack of bills). Balentine took the money that Wilson had given him for the cocaine and handed it to Santoyo, who then put it on the table in front of Reyes. (Count Twelve.)
 
 
 18
 On June 24, Rulapaugh and McMahan went to the Torres house to buy cocaine. Inside, Rulapaugh asked Bonnie for an ounce of cocaine. Bonnie said that she did not have that amount, but was waiting for "Yolanda and Mackie" (Reyes and Santoyo) to return from Chicago with three "keys" (kilograms). Rulapaugh and Bonnie agreed to set up the deal to be consummated later that evening. Later, Rulapaugh picked up Bonnie and Bryan and drove to the place that they were to meet McMahan. McMahan was late, and during the wait, Bryan told Bonnie that if she thought that McMahan was a police officer, she should signal Bryan and he would run off with the drugs. McMahan never showed, and they left. Later still, McMahan contacted Rulapaugh, and she returned to the Torres house, picking up Balentine and Bryan and driving to the bar to make the sale. Bryan got into McMahan's car and, after dickering over weight and price, gave him the cocaine in exchange for cash. The price was $1675 for one ounce, but Bryan did not have $5 in change for the $1680 that McMahan gave Bryan, so Bryan told him that he would pay him on their next deal. During the transaction, Balentine walked around McMahan's car, watching what was taking place. After the transaction, McMahan gave his pager number to Balentine, because Balentine and Bryan were unsure about his identity. Rulapaugh then returned Balentine and Bryan to the Torres house. (Count Thirteen.)
 
 
 19
 Informant Jose Gonzalez testified that he had been a cocaine user and had bought cocaine from Santoyo and Reyes before cooperating with the authorities. On July 7, he and McMahan went to Michael Santoyo's residence to buy cocaine. Gonzalez asked them if they had cocaine to sell; they said that none was available at that time, but that they would go get some. Gonzalez and McMahan left, and saw Reyes drive away from Michael Santoyo's house. Other officers followed her to the Carrillo-Santoyo house. Reyes returned a short time later, and Gonzalez and McMahan returned to the house. Reyes took some cocaine from her purse and gave it to Gonzalez, who gave money to Santoyo, who in turn handed it to Reyes. Gonzalez returned to the car where McMahan was waiting and gave the cocaine to him. The cocaine was packaged in folded pink paper. (Count Fourteen.)
 
 
 20
 On September 17, search warrants were executed at the Torres house and at the Carrillo-Santoyo house. At the Carrillo-Santoyo house--the first-floor apartment of a two-family house--the officers found Santoyo and Carrillo in the master bedroom and three small children present in the house. Next to the master bedroom was a storage room, in which was found on a coffee table an Ohaus triple beam scale (which is apparently commonly associated with drug distribution) and, in the coffee table, a bottle of Inositol (which is used to "cut" (dilute) cocaine) and a spiral notebook with pink paper, writing that was (according to McMahan) characteristic of records kept by drug traffickers (i.e., numbers reflecting weights and prices), a note addressed to "Michael" signed by "Lisa" referring to the payment of some bills, and the name "Carrillo." A similar notebook, containing similar drug trafficking records, was found in the dresser in the master bedroom. About twenty-five grams of cocaine (worth $2500 to $3750 on the market) was found on a shelf in the closet of the storage room. The pink paper in the notebooks was similar to the folded paper that contained the cocaine sold to Gonzalez and the cocaine found in the search of the Torres residence. Rectangular portions were torn from the pages of the notebooks, and the torn edges of one of the paper packets at the Torres residence matched the torn edge of one of the pages from the notebook found in the coffee table in the storage room at the Carrillo-Santoyo house. Other records at the Carrillo-Santoyo house show that the phone was in the name of Maria Carrillo and the utilities were in Lisa Santoyo's name. (Count Fifteen.)
 
 
 21
 The search of the Torres house yielded two paper packets containing cocaine (one with 6.6 grams and the other with 1.3 grams of cocaine) and a "baggie" with 1.5 grams of marijuana, found in the master bedroom. McMahan testified that cocaine is commonly sold in this manner (both in the amount--a "16th" is 1.3 or 1.4 grams, and a "quarter ounce" is about 7 grams--and in folded paper). (Count Sixteen.)
 
 
 22
 Michael Santoyo presented the testimony of another of his daughters, Elizabeth Woodward. She testified that she had lived with Santoyo between August 1991 and September 1992 and that she saw no cocaine sales or drug dealing during that time. On cross examination, over defense counsel's objection, Woodward testified that Santoyo had called her from New York in August 1992 and told her that he had been stopped in New York and that the authorities had seized $17,000 and "a quantity of cocaine."
 
 
 23
 Bryan testified that he was not a member of any conspiracy and that he participated in the sales of cocaine from the Torres house only in order to satisfy his cocaine addiction. The jury, apparently, was unpersuaded.
 
 
 24
 The issues raised as to the convictions include improper admission of co-conspirators' statements, variance between the indictment and proof, insufficiency of the evidence, improper admission of testimony under Fed.R.Evid. 404(b), and ineffective assistance of trial counsel. The sentencing issues include the quantity of drugs attributed to the defendants and whether a reduction was warranted for minimal participation or acceptance of responsibility. We address each contention in turn.
 
 III
 
 25
 * Several of the defendants argue that the district court improperly admitted inculpatory hearsay testimony of their co-conspirators. Hearsay is inadmissible under the Federal Rules of Evidence. Fed.R.Evid. 802. However, a statement is not hearsay if it is "offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E).
 
 
 26
 In order to render admissible under Rule 801(d)(2)(E) a statement that is otherwise inadmissible, the government must show by a preponderance of the evidence that (1) a conspiracy existed, (2) the defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. United States v. Moss, 9 F.3d 543, 548-49 (6th Cir.1993); United States v. Vinson, 606 F.2d 149, 152-53 (6th Cir.1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020 (1980); United States v. Enright, 579 F.2d 980, 986 (6th Cir.1978). The district court must make a finding that the government has met its burden, but may admit the statements in question subject to a later ruling that this burden was met. Moss, 9 F.3d at 549. The district court may consider the hearsay statements themselves in ruling on admissibility under Rule 801(d)(2)(E). Bourjaily v. United States, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781 (1987); United States v. Barrett, 933 F.2d 355, 358 (6th Cir.1991).
 
 
 27
 The district court has considerable discretion in making its Rule 801(d)(2)(E) determination. Moss, 9 F.3d at 549; Barrett, 933 F.2d at 358. Whether the conspiracy existed, whether the defendant was a member of the conspiracy, and whether the co-conspirator's statements were made in furtherance of the conspiracy are "factual determinations" governed by the "clearly erroneous" standard of review. United States v. Gessa, 971 F.2d 1257, 1261 (6th Cir.1992) (en banc). Based on the district court's factual determinations, whether Rule 801(d)(2)(E) permits the "otherwise hearsay" statements to be received as "not hearsay" is a question of law, reviewed de novo. Ibid.
 
 
 28
 The district made the following findings with respect to Rule 801(d)(2)(E):
 
 
 29
 I will find from the evidence, and rather easily from the evidence, that there was a conspiracy as alleged and that the statements that were made and which either were objected to in specific terms ... through the course of this trial but perhaps more importantly which could have been objected to and that, I will grant as a matter of blanket objection articulated at the beginning of the case on behalf of all the defendants here, statements which could have been objected to as hearsay and which the government intended to rely upon principles enunciated in Vinsen [sic ] and Enright in the 6th Circuit I find to have been made during the course of that conspiracy.
 
 
 30
 Each statement, I find, was made in the furtherance of the conspiracy. Some more significant than others, certainly, but I think the statements certainly were made during the course of and in the furtherance of the conspiracy, and they were made by coconspirators.
 
 
 31
 J.A. at 544-45.
 
 
 32
 Michael Santoyo argues, with respect to Counts Ten and Twelve, that the district court erred in admitting Nichols's testimony that Edward Plaskewicz said on February 11 that Santoyo would be providing the cocaine and in admitting Wilson's testimony that Balentine Torres said on May 19 that the cocaine came from Santoyo and Reyes, sitting at the table. Santoyo's argument principally challenges the finding that the statements were made in the course of or in furtherance of the conspiracy. Both statements identify Santoyo as the supplier of the cocaine. Statements identifying the source of the drug have been held to be in furtherance of the drug conspiracy. See, e.g., United States v. Ayotte, 741 F.2d 865, 869 (6th Cir.), cert. denied, 469 U.S. 1076, 105 S.Ct. 574 (1984). To the extent that Santoyo argues that the district court improperly relied on the statements themselves, that argument is without merit. Bourjaily, 483 U.S. at 181, 107 S.Ct. at 2781. To the extent that Santoyo's argument can be construed as raising an insufficiency-of-the-evidence argument, it fails, too: Counts Ten and Twelve charge Santoyo with distribution of cocaine, and certainly supplying cocaine is grounds for a conviction for distribution. As both statements in question identify Santoyo as the supplier (and, indeed, the May 19 statement is followed by a transfer to Santoyo and Reyes at the table of the cash used to purchase the cocaine), there was sufficient evidence to convict Santoyo on Counts Ten and Twelve.
 
 
 33
 Yolanda Reyes argues that the district court erred in allowing Rulapaugh's testimony that Bonnie Torres told her that Reyes had dropped off an ounce of cocaine (and had told her to flush it), and that she (Bonnie) was waiting for Reyes and Michael Santoyo to bring back three kilograms of cocaine from Chicago. Reyes says that she was denied her "right to confront the statements made by the nontestifying co-defendant." Reyes also argues that there was no foundation to admit her alleged statements because neither a conspiracy nor her participation in one had been shown.
 
 
 34
 Reyes's arguments about the admission of Rulapaugh's testimony about Bonnie Torres's statements fail for the same reasons that Santoyo's arguments fail--the statements identify Reyes as a source of the drugs. Bourjaily also laid to rest any arguments that the Confrontation Clause is violated when co-conspirators' statements are admitted under Rule 801(d)(2)(E). 483 U.S. at 181-84, 107 S.Ct. at 2782-83. Thus, Reyes's argument to the contrary is without merit. Finally, we hold that, based on the testimony of the undercover officer and of the informants and on the evidence seized, the district court was not clearly erroneous in finding that a conspiracy existed, that Reyes was a member of the conspiracy, and that Bonnie Torres's statements to Rulapaugh were made in the course of that conspiracy.
 
 B
 
 35
 Carl Bryan contends that, although the indictment alleged one conspiracy, the only evidence at trial showing his involvement in a conspiracy is his association with the Torreses and therefore more than one conspiracy was proved. He claims, too, that the admission of co-conspirators' statements and his joinder at trial with the other defendants prejudiced him.
 
 
 36
 A variance occurs when the indictment alleges only one conspiracy yet the evidence adduced at trial can reasonably be construed to support a finding of multiple conspiracies. Moss, 9 F.3d at 551. Where a variance occurs, "reversal is required only where the substantial rights of a defendant have been affected." Ibid.; United States v. Warner, 690 F.2d 545, 548 (6th Cir.1982). "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." Moss, 9 F.3d at 551 (quoting United States v. Bakke, 942 F.2d 977, 985 (6th Cir.1991)). "Whether a single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury under proper instructions and to be considered on appeal in the light most favorable to the government." Ibid. (quoting United States v. Grunsfeld, 558 F.2d 1231, 1238 (6th Cir.1977) (per curiam)).
 
 
 37
 The evidence adduced at trial was sufficient for the jury to have found a single conspiracy, as alleged, of which Bryan was a part. According to the testimony from the informants and the undercover officer, Bryan sold cocaine to informants, controlled access to the Torres house, ushered informants in and out of the house, and transferred cocaine from the Torreses to the buyers. The testimony also established that the cocaine was supplied by Michael Santoyo and Yolanda Reyes, the sources for the other sellers participating in this conspiracy. Bryan may not have known all of the other members of the conspiracy or conducted drug transactions with each of them, but knowledge of each of the other co-conspirators is unnecessary, as is conducting transactions with each of them, in order to prove a single conspiracy. The testimony established that the Torreses were part of a single conspiracy, and Bryan, through them, was a part of it.
 
 
 38
 Some of the language in Bryan's brief is couched in terms of joinder and severance. However, it appears that he made no motion for severance, or at least he does not argue that the district court improperly denied such a motion. In any event, Bryan would have to make a "showing of compelling prejudice" for a failure to sever his trial from the others'. Warner, 690 F.2d at 552. His "showing" amounts to nothing more than an allegation that evidence against the other defendants was admitted during the trial and therefore, because he was "not truly" a co-conspirator, he was denied a fair trial. As the evidence establishes that he, in fact, was a co-conspirator and as there is no showing of prejudice, we hold that Bryan was not denied a fair trial.
 
 C
 
 39
 Several of the defendants argue that the district court improperly denied their Rule 29 motions for judgment of acquittal or that there was insufficient evidence to support the various convictions. On review of a denial of a Rule 29 motion or a claim of insufficiency of the evidence, we do not weigh the evidence or determine the credibility of witnesses. Instead, taking the view most favorable to the government, we determine whether there is substantial evidence supporting the jury's verdict. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1942); Bakke, 942 F.2d at 985.
 
 
 40
 In order to establish a drug conspiracy, the government must prove that a conspiracy existed, that the defendant knew of the conspiracy, and that the defendant knowingly and voluntarily joined it. Barrett, 933 F.2d at 359; United States v. Lee, 991 F.2d 343, 347-48 (6th Cir.1993).
 
 
 41
 A trier of fact may infer knowledge of and participation in the common purpose and plan of a conspiracy based on defendant's actions and reactions to the circumstances. The government may demonstrate that a defendant had the requisite knowledge by showing that defendant knew the essential object of the conspiracy. The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that defendant was a party to the general conspiratorial agreement.
 
 
 42
 Barrett, 933 F.2d at 359 (citations omitted). Thus, the agreement can be tacit and inferred. Warner, 690 F.2d at 549; Lee, 991 F.2d at 348. A co-conspirator need not know every other member or be involved in all of the activities of the conspiracy. Warner, 690 F.2d at 549. "Circumstantial evidence standing alone can sustain the jury's verdict, and such circumstantial evidence need not remove every reasonable possibility except that of guilt." Lee, 991 F.2d at 348.
 
 
 43
 As to Balentine Torres's claims, informant Wilson testified that he bought cocaine from Balentine on October 22 and that Balentine offered to sell him more. This provides sufficient evidence for Count Four. As to Count Five, the government concedes that, because Wilson's only possible mention of Balentine is a reference to "they" (in the context that "they" told him cocaine might be available later), there is insufficient evidence to uphold Count Five as to Balentine. Govt. Brief at 33. We agree, and reverse Balentine's conviction on Count Five.
 
 
 44
 As to Count Thirteen, Balentine watched the drug transaction take place in McMahan's car (between Bryan and McMahan) and took McMahan's pager number. The jury could infer from this evidence that Balentine was supervising the drug transaction. As to Count Sixteen, the search of the Torres house turned up two packets of cocaine packaged in amounts standard for sale and in paper "folds" used in the sales to the informants. This evidence was found in the bedroom, from which cocaine in some of the sales had been retrieved. Count Sixteen is supported by sufficient evidence.
 
 
 45
 We also hold that the evidence found at the Carrillo-Santoyo house--the scale, the Inositol, the pink paper, drug trafficking records, and cocaine--together with Reyes's July 7 trip to the house to get cocaine, is sufficient to uphold the convictions of Lisa Santoyo and Michael Carrillo on Count Fifteen.
 
 
 46
 On Michael Santoyo's claims, informant Nichols's testimony established that Santoyo was the supplier of the cocaine for the transaction on February 11. Informant Wilson's testimony established that Santoyo was the source of the cocaine for the May 19 transaction; also, the money was transferred to Santoyo at the kitchen table. Thus, as noted above, there was sufficient evidence to find Santoyo guilty on Counts Ten and Twelve. Informant Gonzalez testified that on July 7, Reyes gave him the cocaine, and he gave the money to Santoyo, who gave the money to Reyes. He also testified that Santoyo and Reyes told him that they would get cocaine for him on that date. Thus, sufficient evidence also supports the conviction on Count Fourteen.
 
 
 47
 As to Count One, the testimony establishes that Santoyo participated in the conspiracy. Nichols testified that Edward Plaskewicz said that Santoyo would deliver the cocaine sold on February 11 (and he did arrive later, and an exchange was consummated). Rulapaugh testified that Bonnie Torres identified Reyes, Santoyo's live-in girlfriend, as the source of the cocaine. Wilson testified that Santoyo was the source of the cocaine sold on May 19, and Santoyo and Reyes were seen counting a three-inch stack of bills, into which cash, which had just been exchanged for cocaine, was placed. Rulapaugh testified that Bonnie Torres said that Santoyo and Reyes were bringing in three kilograms of cocaine from Chicago. Gonzalez testified that Santoyo took the money for the cocaine on the July 7 purchase. Further, Nichols and Gonzalez testified that they had bought cocaine from Santoyo in the summer of 1991, which establishes the background and development of the conspiracy, as explained below. Thus, sufficient evidence supports Michael Santoyo's conviction on Count One.
 
 D
 
 48
 Edward Plaskewicz and Michael Santoyo argue that the district court improperly admitted certain testimony under Fed.R.Evid. 404(b). Specifically, they contend that the informants' testimony as to their drug dealings in the summer of 1991--during a time preceding the existence of the conspiracy as alleged in the indictment--should not have been admitted. In addition, Santoyo and Yolanda Reyes argue that Elizabeth Woodward's testimony regarding the New York stop and seizure of cash and cocaine should not have been admitted.
 
 Rule 404(b) provides that:
 
 49
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
 
 
 50
 Thus, in order for evidence to be admissible under Rule 404(b), the government must establish that (1) the evidence is relevant for a purpose other than to show character or criminal propensity, and (2) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice under Rule 403. United States v. Okayfor, 996 F.2d 116, 120 (6th Cir.) (per curiam), cert. denied, 114 S.Ct. 238 (1993).
 
 
 51
 Four requirements protect against unfair prejudice from the admission of "other crimes" evidence. The evidence must be relevant; it must be offered for a "proper purpose"; its probative value must not be substantially outweighed by its potential for unfair prejudice; and a limiting instruction on the purpose for which it is admitted must be given when requested. Bakke, 942 F.2d at 981.
 
 
 52
 The relevancy requirement requires a showing that the proffered evidence relates to a matter that is "in issue" in the case. Id. at 982. The prior acts must be "substantially similar to, and near in time to, the offense charged in the indictment." United States v. Jerkins, 871 F.2d 598, 604 (6th Cir.1989) (quoting United States v. Ismail, 756 F.2d 1253, 1259 (6th Cir.1985)). In establishing the tendered evidence's relevance, the government must "articulate [a] theory of admissibility" and not "merely parrot[ ] the language of Rule 404(b)." United States v. Zelinka, 862 F.2d 92, 99 (6th Cir.1988). We have upheld the admission, under Rule 404(b), of evidence of prior drug dealing; such evidence is "clearly admissible for the 'legitimate purpose of showing the background and development of a conspiracy.' " United States v. Paulino, 935 F.2d 739, 755 (6th Cir.) (quoting United States v. Hitow, 889 F.2d 1573, 1578-79 (6th Cir.1989)), cert. denied, 112 S.Ct. 315 (1991).
 
 
 53
 The district court first must determine as a matter of preliminary fact whether there is sufficient evidence that the prior act occurred. Second, a legal determination must be made whether the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan." Finally, in ruling on the admission of Rule 404(b) evidence, the district court must determine whether the "other acts" evidence is more unfairly prejudicial than probative, which is reviewed for abuse of discretion. Gessa, 971 F.2d at 1261-62. "The district court enjoys broad discretion relative to the admissibility of evidence pursuant to Rule 404(b)." Okayfor, 996 F.2d at 120. An improper Rule 404(b) ruling is subject to harmless error analysis; the defendant's substantial rights to a fair trial must have been affected to warrant reversal. Ibid. (citing United States v. Reed, 647 F.2d 678, 687 (6th Cir.1981)).
 
 
 54
 In this case, the informants' testimony regarding drug purchases in the summer of 1991 drew objections. The district court issued a written order denying a motion for mistrial based on the admission of this testimony, finding that it was relevant and had little potential for prejudice to the defendants. The order also directed the government to give notice of its intent to use Rule 404(b) evidence in the future. The district judge also gave the jury a cautionary instruction on the Rule 404(b) evidence:
 
 
 55
 So testimony concerning these things before this conspiracy period are actually outside of the conspiracy. They're not--the people are not on trial for things they may have done in the summer of 1991. However, testimony concerning those things is acceptable, I'm allowing that into evidence, but for a limited purpose.
 
 
 56
 You should not consider testimony about those things, such things as the summer of 1991 drug distributions, and lump that in with everything that you have heard about, for example, 1992.
 
 
 57
 You should only allow yourselves to consider that evidence in determining whether there was, for example, a pattern of action, a plan of action that was consistent through this time period. It may help you to determine that.
 
 
 58
 There may be other particular limited purposes that I will tell you about at the end of the trial, but that is at least one example that I will caution you about. That is, to remember, please, the defendants here, everyone of them, is specifically on trial only for the acts that are charged in the indictment and you are going to have to be satisfied from the evidence about the proof of things that are actually charged in the indictment and not allow yourselves to just meld all of these things in together.
 
 
 59
 J.A. at 426. Thereafter, the government called informant Rulapaugh to testify, and she testified to pre-conspiracy drug-dealing, without the government having given the required notice, apparently through inadvertence (the government says that it did not see the written order's requirement that notice be given). The district judge found, however, that her testimony was "neither shocking nor inflammatory" and "well within a reasonable range of expected testimony from such a witness about such events," and that there was "no basis to determine actual prejudice." Defense counsel declined to request another limiting instruction, for the familiar reason that it would unduly emphasize the testimony. J.A. at 448.
 
 
 60
 During the general instructions to the jury, the district judge told the jury:
 
 
 61
 You have heard evidence that some defendants did things other than those charged in the indictment. And I'm speaking here particularly of evidence concerning the drug sales during the summer of 1991, that is a time which is before the conspiracy on trial here is charged to have begun. You may not consider this evidence, I'm talking about these other acts, to prove that any defendant did the acts that he is on trial for now. You may consider these other acts however, but only for the purposes of determining whether there existed a plan or a scheme to sell drugs or to help you in determining whether any defendant did things intentionally as opposed to accidentally but for no other purpose.
 
 
 62
 Thus, the district court allowed the informants' testimony into evidence for the purpose of establishing plan or intent. These purposes are specifically allowed under Fed.R.Evid. 404(b). Thus, Edward Plaskewicz's contention that the district court never articulated under which Rule 404(b) exception the testimony falls is without merit. Further, his complaint that no notice was given of Rulapaugh's testimony was handled by the district judge in an appropriate manner, although we caution prosecutors to pay closer attention in the future to the court's orders, written and otherwise, as well as to the text of Rule 404(b).
 
 
 63
 In its written order, the district court determined that "the evidence of similar cocaine purchases made by the witnesses is very closely related in time to the events under the indictment, that it contains no shocking or inflammatory implications and that there is accordingly a very low potential of improper or prejudicial value that attaches to the evidence." J.A. at 91. The court also found that no notice had been requested prior to the issuance of the written order. J.A. at 90-91.
 
 
 64
 The findings by the district court that the prior acts occurred, based as they were on the testimony of the witnesses, do not appear clearly erroneous (and, indeed, do not appear challenged by the defendants--they challenge only the admissibility of the testimony regarding such acts). As to the relevance of such evidence, the district court admitted the testimony for purposes of proving plan or intent. As we have held, evidence of prior drug sales may be admitted under Rule 404(b) to prove the background or development of a drug conspiracy, which encompasses plan and intent. Thus, the district court's relevancy determination was not incorrect. Finally, the district court did not abuse its discretion in determining that the probative value of the informants' testimony regarding the summer 1991 drug sales was not outweighed by its prejudicial effect.
 
 
 65
 Santoyo and Reyes complain that the district court improperly admitted Woodward's testimony under Rule 404(b). Under Fed.R.Evid. 611, which governs the trial court's control of the examination of witnesses:
 
 
 66
 a trial judge has considerable discretion and a judge's ruling will not be the basis for reversal of a criminal conviction unless a defendant's substantial rights are affected. ... Cross-examination into collateral and other matters "as if on direct" are addressed to the court's discretion. The "subject matter of the direct examination," within the meaning of Rule 611(b), has been liberally construed to include all inferences and implications arising from such testimony.
 
 
 67
 United States v. Moore, 917 F.2d 215, 222 (6th Cir.1990) (citations omitted), cert. denied, 499 U.S. 963, 111 S.Ct. 1590 (1991). Woodward, Santoyo's daughter, testified on direct examination that Santoyo and Reyes did not deal in drugs and no cocaine was ever present in their house; on cross examination, she maintained that Santoyo was merely a drug user. When defense counsel objected to the prosecutor's questioning about the New York stop and seizure, the district court found that the questioning of Woodward with respect to the New York stop and seizure of the $17,000 and "a quantity" of cocaine[1] was within the scope of direct, because it related to the credibility of the witness as well as to the matters testified to on direct. J.A. at 576-77. The court also found that the prejudicial effect did not outweigh the probative value of the testimony. J.A. at 577. No mention was made to the jury of Reyes in the questioning about the New York incident. Because the jury reasonably could infer that the testimony about the New York incident contradicted Woodward's testimony on direct examination that Santoyo and Reyes, Santoyo's live-in girlfriend, were not drug dealers, the district court's ruling was not an abuse of discretion. Further, the testimony concerned acts directly related to the conspiracy--the supplying of cocaine by Reyes and Santoyo--and so was not merely evidence of "other crimes" under Rule 404(b).
 
 E
 
 68
 Yolanda Reyes raises on appeal, for the first time, a claim of ineffective assistance of counsel. She claims that her trial lawyer failed to make various objections and motions. We ordinarily will not review an ineffective assistance of counsel claim for the first time on appeal. United States v. Straughter, 950 F.2d 1223, 1234 (6th Cir.1991), cert. denied, 112 S.Ct. 1238 (1992); United States v. Swidan, 888 F.2d 1076, 1081 (6th Cir.1989). We see no reason to depart from this familiar rule in this instance.
 
 IV
 
 69
 and
 
 
 70
 Seven of the nine defendants contest the district court's findings as to the quantity of drugs for which they were held responsible for sentencing purposes.
 
 
 71
 A district court's factual findings regarding the amount of narcotics for which a defendant is to be held accountable are accepted by this court unless clearly erroneous. For sentencing purposes, the amount of drugs involved in a crime need only be proved by a preponderance of the evidence. However, a defendant is chargeable for the drug transactions of other members of the conspiracy only if they were known to him or were reasonably foreseeable to him.
 
 
 72
 Okayfor, 996 F.2d at 120 (citations omitted); Moss, 9 F.3d at 552. The district court must determine the scope of the criminal activity each particular defendant agreed to undertake jointly in order to determine each defendant's accountability for the conduct of others. Okayfor, 996 F.2d at 121. The amount of drugs under negotiation, even in an uncompleted distribution, shall be used to calculate the total amount of drugs in determining the defendant's offense level. United States v. Perez, 871 F.2d 45, 48 (6th Cir.), cert. denied, 492 U.S. 910, 109 S.Ct. 3227 (1989). If the government satisfies its burden of establishing a negotiated amount of drugs, the defendant has the burden of proving that he was not capable of producing that amount. United States v. Christian, 942 F.2d 363, 368 (6th Cir.1991), cert. denied, 112 S.Ct. 905 (1992).
 
 
 73
 As to Carl Bryan, the district court found that he had consistently participated in the conspiracy, by selling drugs. The district court determined that Bryan knew that Michael Santoyo and Yolanda Reyes were the source of the cocaine from Chicago, and therefore he was responsible for the three kilograms that they brought in from Chicago (according to Bonnie Torres). Given Bryan's role in the conspiracy--the sales and his ushering in and out of the house the informants--the district court did not err in attributing the three kilograms of cocaine, in addition to the drugs for which he was directly responsible, to Bryan.
 
 
 74
 As to Edward and Keith Plaskewicz, the district court found that they worked together and that therefore conduct attributable to one should be attributable to both. This finding is not clearly erroneous: both lived in the same house, both tried to uncover the facts about McMahan and Nichols on February 11, and Michael Santoyo refused to sell the cocaine to Edward (who brought Nichols and McMahan to Santoyo's house) until he had contacted Keith. Further, the court based its determinations of the quantity of drugs attributed to the Plaskewiczes on their statements as to how much they could provide or would sell. Amounts under negotiation properly are used in calculating offense levels.
 
 
 75
 As to Bonnie Torres, the district court determined the amount of drugs for which she was responsible based on statements that she was expecting two kilograms from her source on one occasion, and three kilograms from Chicago on another occasion. The court also found that she was
 
 
 76
 deeply involved and an eminently knowledgeable participant in this conspiracy. She was not some distant foot soldier in a long parade of intermediaries. She was heavily involved, consistently involved and was very knowledgeable about the overall conspiracy, its substance and the quantities that were being imported and sold.
 
 
 77
 J.A. at 719. The court's findings are not clearly erroneous, given Bonnie's participation in the conspiracy.
 
 
 78
 The district court based the sentences of Lisa Santoyo and Michael Carrillo on the amount of cocaine found at their house when the search warrant was executed and the amounts that Reyes sold to informant Gonzalez on July 7 and that Gonzalez estimated that Reyes had in her purse, which amounts Reyes had obtained from the Carrillo-Santoyo house. The amount sold to Gonzalez and the amount found at the house were weighed, so the findings with respect to those amounts (27.48 grams of cocaine) are not clearly erroneous. Gonzalez testified that he saw an ounce of cocaine (28.35 grams) in Reyes's purse; although probably not the best way to estimate the amount of drugs for sentencing purposes, it is not clearly erroneous, especially given Gonzalez's history as a drug user. In any event, Santoyo and Carrillo stress the lack of connection between them and the drugs provided by Reyes on July 7. Testimony established, however, that on that date, no drugs were available at Michael Santoyo's house until Reyes went to the Carrillo-Santoyo house and was then able to provide the drugs.
 
 
 79
 As to Michael Santoyo, the district court based its determination of the amount of drugs for which he was responsible on the amount purchased by the informants or McMahan, the amount seized in New York, and the amounts based on statements made by the co-conspirators. Bonnie Torres said that she was getting two kilograms of cocaine from "old man Jackson," which McMahan said referred to Santoyo. Bonnie also said that Santoyo and Reyes were bringing three kilograms from Chicago. These five kilograms, and the amounts from the sales in which Santoyo was involved, put Santoyo in the five-to-fifteen kilogram category, under which the district court sentenced him. His sentence therefore was not clearly erroneous.
 
 
 80
 In considering the dissent's objections to the sentences imposed on Michael Santoyo, Bonnie Torres, and Carl Bryan, we should focus on the critical question of whether each one of the defendants was responsible for over five kilograms of cocaine, as the district court held. Each of the defendants was undoubtedly responsible for a certain amount of cocaine directly distributed to undercover agents, ranging from approximately 20 grams from Michael Santoyo, to approximately 47 grams from Bonnie Torres and Carl Bryan. In addition, a little more than 31 grams of cocaine was seized from the two houses, and informants saw more than 200 grams in the possession of Santoyo, Torres, or Bryan.
 
 
 81
 In addition, there were three controverted amounts, involving 2 kilograms ("Old Man Jackson"), 3 kilograms (from Chicago), and 4 kilograms (the New York incident, which the dissent discusses extensively). The district judge's ultimate conclusion was correct unless he clearly erred in finding that there was a preponderance of the evidence supporting the 2- and 3-kilogram transactions (Bryan and Torres) or any two of the three transactions (Santoyo).
 
 
 82
 The dissent may be correct in believing that it is more just, in some cosmic sense, that Bryan, whom it characterizes as a "small-time, street-level dealer," should receive a sentence less than that imposed in this case. However, if the district judge acted within his authority in making the findings that he did, then the determination of proper punishment has been made by Congress in enacting the Guidelines procedure. See Mistretta v. United States, 488 U.S. 361, 109 S.Ct. 647 (1989).
 
 
 83
 There was adequate evidence to support the district judge's findings. These individuals were not mere "mules" or simply delivery persons. Bryan and Torres were intimately involved in running a sales operation from their own house, and there was adequate evidence that they knew they were involved in a larger operation and that the suppliers obtained larger quantities of cocaine to supply their operation, among others. Santoyo was involved in the entire operation.
 
 
 84
 Unless one believes that the entire Santoyo-Reyes apparatus existed only to sell to the government informants, it is not at all surprising that an operation that could sell to agents or make sales witnessed by agents of over 50 grams over a one-year period would be selling to enough other purchasers that multi-kilogram amounts were entirely plausible. The direct evidence, which the district judge was entitled to take into account, even if of a hearsay nature, provided an adequate basis for including the amounts of cocaine to which members of the conspiracy made specific reference.
 
 
 85
 Because the district court's factual findings as to the amounts of drugs attributable to each defendant are not clearly erroneous, we shall uphold against this challenge the sentences imposed.
 
 B
 
 86
 Michael Carrillo and Keith Plaskewicz argue that they should each receive a reduction for their allegedly minimal roles in the offense. The "minimal participant" reduction is to be used "infrequently." USSG Sec. 3B1.2, comment. (n. 2). It
 
 
 87
 applies to a defendant who plays a minimal role in concerted activity. It is intended to cover defendants who are plainly among the least culpable of those involved in the conduct of a group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant.
 
 
 88
 Id., comment. (n. 1).
 
 
 89
 The defendant must show by a preponderance of the evidence that he is entitled to a mitigating-role reduction. United States v. Morrison, 983 F.2d 730, 732-33 (6th Cir.1993); Okayfor, 996 F.2d at 122. The district court's finding as to a defendant's role in the offense is reviewed for clear error. United States v. Williams, 940 F.2d 176, 180 (6th Cir.), cert. denied, 112 S.Ct. 666 (1991); Okayfor, 996 F.2d at 122.
 
 
 90
 The district court did not err in not granting a reduction to Carrillo. Simply put, Carrillo presents no argument or evidence to persuade us otherwise. Similarly, Keith Plaskewicz makes no showing as to why the failure to grant him a "minimal participant" reduction is clearly erroneous, so his sentence will not be disturbed on this ground.
 
 C
 
 91
 Keith Plaskewicz also argues that he should have received a reduction for acceptance of responsibility. A defendant must show by a preponderance of the evidence that he has accepted responsibility for the crimes he has committed in order to receive a reduction under Sec. 3E1.1. Whether the defendant has accepted responsibility is a question of fact, and the district court's assessment of this is accorded great deference and is not to be disturbed unless clearly erroneous. Williams, 940 F.2d at 181; United States v. Crousore, 1 F.3d 382, 386 (6th Cir.1993). The "determination of the sentencing judge is entitled to great deference on review." U.S.S.G. Sec. 3E1.1, comment. (n. 5). Keith Plaskewicz makes no showing as to how the failure to grant him a reduction for acceptance of responsibility was clearly erroneous, so his sentence will not be disturbed on this ground, either.
 
 V
 
 92
 For the foregoing reasons, the convictions and sentences of the defendants are AFFIRMED, except as to the conviction of Balentine Torres on Count Five, which is REVERSED. Because Balentine Torres received concurrent sentences of equal length on each count of conviction, there is no need to remand his case for resentencing.
 
 
 93
 HOLSCHUH, Chief District Judge, concurring in part and dissenting in part.
 
 
 94
 I concur in the carefully written opinion of Judge Boggs affirming the convictions of all defendants in this case. I write separately with regard to the admission of the cross-examination testimony of Elizabeth Woodward, and I respectfully dissent with regard to the sentences imposed by the trial court on Michael Santoyo, Bonnie Torres and Carl Bryan.
 
 THE WOODWARD CROSS-EXAMINATION
 
 95
 I believe it was error to admit the testimony of Elizabeth Woodward, the daughter of defendant Michael Santoyo, concerning a statement made by her father regarding his arrest in New York in August 1992 and the seizure by the New York authorities of $17,000 and a quantity of cocaine. This testimony was elicited on cross-examination by the government attorney and admitted over the strenuous objections of the attorneys for Santoyo and his girl friend, Yolanda Reyes.
 
 
 96
 Mrs. Woodward was called by Santoyo's attorney and testified on direct examination that from August 1991 to September 1992 she, her husband and her brother had lived with her father, Ms. Reyes, and Ms. Reyes' three children at 1012 South Washington Street, Saginaw, Michigan; that during that period of time she had not seen her father or Ms. Reyes sell any cocaine; that she had not seen cocaine in the house; and that she had not seen anyone give Santoyo or Ms. Reyes money for cocaine.
 
 
 97
 On cross-examination, the government attorney asked:
 
 
 98
 Q. Did they (an apparent reference to Santoyo and Ms. Reyes) ever talk about $17,000 and New York City?
 
 
 99
 A. No.
 
 
 100
 Q. So they never told you they were in a van in New York City with $17,000?
 
 
 101
 After objection was made by defense counsel, the Court stated that he was "inclined to think it was beyond the scope of direct." J.A. at 560. Following a side bar argument, the Court permitted the witness to be examined outside the presence of the jury, at which time the government attorney elicited from the witness the fact that in August 1991 her father had called her from New York to tell her he had been arrested and that $17,000 had been taken from Ms. Reyes and that she had a quantity of cocaine in her purse. J.A. at 570. The Court then held that the intended cross-examination was "within the scope of reasonable inferences drawn from the breadth of the direct examination," J.A. at 576, that it was relevant and served to question the credibility of the witness, and that its probative value was not substantially outweighed by the danger of unfair prejudice. After denying Ms. Reyes' attorney's motions for a mistrial and for a separate trial, he recalled the jury and permitted the government attorney to proceed with his cross-examination. The attorney then elicited the following testimony from the witness:
 
 
 102
 Q. And sometime in the middle of the month your father left home?
 
 
 103
 A. Yes.
 
 
 104
 Q. And he did not tell you that he was leaving or where he was going?
 
 
 105
 A. No.
 
 
 106
 Q. And on some occasion after that, within a few days of that, when you realized he was gone he called you on the phone?
 
 
 107
 A. Yes.
 
 
 108
 Q. And at that time he told you that he had been stopped in New York, and that the authorities had seized $17,000 and a quantity of cocaine?
 
 
 109
 A. Yes.
 
 
 110
 J.A. at 579.
 
 
 111
 In my view, the problem with this testimony is much greater than a simple question of whether the scope of the cross-examination exceeded the subject matter of the direct examination or was proper impeachment testimony. I recognize the liberality that a court properly has in exercising sound discretion in such matters under Fed.R.Evid. 611, see e.g., United States v. Moore, 917 F.2d 215, 222 (6th Cir.1990), cert. denied, 499 U.S. 963 (1991), but under the circumstances of this case I believe it was error to permit the government attorney to bring before the jury the telephone conversation concerning the New York arrest and the seizure of money and cocaine.
 
 
 112
 First, the government attorney had received information prior to trial that Santoyo, Ms. Reyes and a third individual had been arrested in New York and that Reyes had $17,000 on her person which was to be used in connection with the importation of four kilograms of cocaine. Ms. Reyes had pled guilty to a charge of conspiracy to import cocaine, but charges against Santoyo were dismissed. According to the government attorney, he had not received this information "until just before trial" and there was not enough time to properly notify defense counsel and present this as evidence in the government's case. (Government brief, pp. 25-26.) He so advised the Court during the colloquy at side bar on the objections when he said:
 
 
 113
 I could not introduce it because I did not feel it was fair to try to get this evidence in my case in chief because we had not given notice to the defense of these facts and circumstances.
 
 
 114
 J.A. at 563-564.
 
 
 115
 Although aware of the highly prejudicial effect of this evidence and of the government's inability to present it as part of its case-in-chief, the government attorney, in my view, saw the opportunity to introduce it by setting up a "straw man" in the form of a cross-examination designed to first elicit a denial that the witness had heard the defendants talk about a large sum of money and then impeach that denial by bringing out the telephone conversation regarding the New York arrest and seizure of both a large sum of money and cocaine by the New York authorities. The direct examination had been very brief and had been confined to what the witness had personally observed while living with the defendants at 1012 South Washington Street, Saginaw, Michigan. Even if the elicited testimony concerning a telephone call from her father in New York could be somehow considered within the subject matter of that direct examination or, even more problematical, as impeaching her credibility because of her earlier answer on cross-examination regarding what "they" said "about $17,000 and New York City," I believe the testimony clearly should have been excluded under Fed.R.Evid. 403.
 
 
 116
 The government attorney knew that the $17,000 and a small amount of cocaine had been found on Ms. Reyes and that all charges against Santoyo had been dismissed, but his question, "and at that time he (Santoyo) told you that he had been stopped in New York, and that the authorities had seized $17,000 and a quantity of cocaine" was designed to leave the impression with the jury that Santoyo had been arrested with the $17,000 and cocaine in his possession. To the extent the elicited, misleading testimony had any probative value, it was substantially outweighed by the danger of unfair prejudice--a danger the government attorney confessed was so great that he knew he could not use such testimony as a part of his case in chief. To slide it in as part of his cross-examination of a relatively unimportant witness whose credibility was already inherently subject to challenge by reason of her relationship as Santoyo's daughter, strikes me as grossly unfair and tipping the scales of Rule 403 in favor of exclusion.
 
 
 117
 Second, while the statement made by Santoyo in his telephone conversation with his daughter was admissible as to him, it constituted hearsay as to the other defendants on trial. The only way in which it could be admitted as to them was as a co-conspirator's statement under Fed.R.Evid. 801(d)(2)(E). I think it clearly was not a statement of a co-conspirator made "during the course and in furtherance of the conspiracy." It was nothing more than a telephone call from a father to his daughter, who was not a member of any conspiracy, telling his daughter what had happened to him in New York. I fail to see how such a statement could be considered as one designed in any manner to further the conspiracy charged in the indictment. Furthermore, as the following colloquy illustrates, the government agreed that the New York conspiracy involving Ms. Reyes' conviction was not the same conspiracy charged in the indictment. In referring to the charged conspiracy, defense counsel questioned government counsel at the side bar:
 
 
 118
 Mr. Perry: Is this the same conspiracy that was involved in New York?
 
 
 119
 Mr. Hluchaniuk: No. She pled guilty to a conspiracy to import cocaine.
 
 
 120
 J.A. at 563.
 
 
 121
 If there was error in the admission of the elicited cross-examination testimony, as I believe there was, the question remains whether such error requires a reversal of the convictions of any of the defendants. I conclude that it does not. Only Santoyo and Ms. Reyes objected to this testimony, and a review of the other evidence presented as to these defendants persuades me that the other evidence against them was more than enough to support their convictions. United States v. Reed, 647 F.2d 678, 687-688 (6th Cir.1981). Given the substantial evidence supporting their convictions, the admission of Mrs. Woodward's testimony was harmless error. Chapman v. California, 386 U.S. 18 (1967).
 
 MICHAEL SANTOYO'S SENTENCE
 
 122
 The New York incident involving Santoyo and Ms. Reyes is resurrected by the government in the sentencing process, and here its impact is obvious as it concerns the sentence imposed on Santoyo. To fully appreciate its impact--as well as the impact of the hearsay statements regarding an additional two kilograms and an additional three kilograms--it is necessary to first review the sentencing calculations made by the probation officer, Dennis A. Roy.
 
 
 123
 The sales of cocaine in this case were of relatively small amounts, ranging from $10.00 for .12 of a gram to $1,680.00 for 27.51 grams. By using the confidential informants to make repeated purchases from Balentine and Bonnie Torres during the year from October 17, 1991 to September 18, 1992 the total, of course, increased. But even with those repeated purchases and even including estimated amounts "witnessed" or "observed," the total cocaine involved in all the drug transactions was less than 300 grams. The probation officer prepared a Drug Summary Chart, a copy being appended hereto, in which he converted these amounts to their marijuana equivalent (in kilograms) because of the seizure of 1.5 grams of marijuana in the search of the Torres home on September 18, 1992. In addition to the cocaine actually sold or "witnessed," the probation officer included the following kilogram amounts of cocaine based on statements allegedly made by Bonnie Torres:
 
 
 124
 Two kilograms of cocaine. According to the Presentence Report (PSR), a confidential informant (Norman Wilson) on October 21, 1991 bought two "papers" of cocaine (.20 of a gram) for $40.00 from Bonnie Torres who, according to the CI's debriefing, "stated that 'Gramps' and the 'old folks' from the 'east side' of town were their, the Torreses' source of cocaine. She also stated that said source had recently obtained two kilograms of cocaine from Florida." Santoyo PSR, p. 4, J.A. at 217. In Wilson's trial testimony he described this purchase of the $40.00 worth of cocaine and, over objection, was permitted to testify that Bonnie Torres "said that there was more cocaine coming to town that night, and if I needed anymore that it was supposed to be coming in, two kilos, from a person, old man Jackson." J.A. at 323.
 
 
 125
 Three kilograms of cocaine. According to the PSR, another confidential informant (Christine Rulapaugh) on June 24, 1992 told the undercover officer (Detective McMahan) "that Ms. Reyes and Michael Santoyo had purchased three kilograms of cocaine earlier in the day and that it was being brought to Michigan from Chicago, Illinois." Santoyo PSR, p. 8, J.A. at 221. In Rulapaugh's trial testimony she testified, over objection, that Bonnie Torres told her that she was waiting for Ms. Reyes and Santoyo "to get back from Chicago, they were going to pick up three keys." J.A. at 438.
 
 
 126
 Based on these reported hearsay statements of Bonnie Torres, the probation officer added five kilograms of cocaine to the amount attributed to Santoyo. The result was that instead of Santoyo being attributed cocaine in an amount of between 200 and 300 grams with a base offense level of 20, he was attributed an amount of 5.26 kilograms with a base offense level of 32. By reaching a 5 kilogram quantity in this manner, Santoyo, with two prior felony drug offense convictions, faced a mandatory term of life imprisonment without release. 21 U.S.C. Sec. 841(b)(1)(A).
 
 
 127
 It is significant that the probation officer did not include in the PSR computations of relevant conduct the four kilograms of cocaine that were the subject of the alleged New York conspiracy. As he stated:
 
 
 128
 Although Ms. Reyes and Mr. Santoyo were arrested together in an attempt to obtain cocaine, it appears to be the position of the government that the activities in New York are separate from the conspiratorial behaviors charged within the instant offense.
 
 
 129
 Santoyo PSR, p. 16, J.A. at 229.
 
 
 130
 Although the government at trial had acknowledged that the New York conspiracy was a separate conspiracy from that charged in the indictment, and although the drug quantities computed by the probation officer in the PSR did not include the four kilograms allegedly involved in that conspiracy, and although it does not appear from the record that the government made any objection to the exclusion of this four kilogram amount from the relevant conduct amount set forth in the PSR,[1] the government attorney at Santoyo's sentencing hearing nevertheless sought, successfully, to include this four kilogram amount in arriving at an amount in excess of five kilograms in order to require the imposition of a sentence of life imprisonment.[2]
 
 
 131
 At the sentencing hearing, Detective McMahan testified that in mid-August 1992, he received a telephone call from "Customs agents in New York" who told McMahan they had "a source in New York that was preparing to deliver four kilograms of cocaine" and that the source was to be paid $17,000 by Santoyo and Reyes. He testified that "a couple phone calls" were placed from New York to give a description of the New York informant and directions on how to find him. One of these calls was made to Santoyo's residence. McMahan later was informed by some unidentified agent in New York that Santoyo, Reyes and Thomas Hinds had been arrested in New York and that Reyes had $17,000 on her person when arrested. J.A. at 733-735. He acknowledged, on cross-examination, that charges against Santoyo arising from the New York incident had been dismissed. J.A. at 736, 738. In view of the fact that there was no evidence at the trial regarding any four kilogram amount of cocaine, McMahan's testimony constituted the only evidence on which to attribute four kilograms of cocaine to Santoyo.
 
 
 132
 McMahan also testified at the sentencing hearing concerning the alleged statement of Bonnie Torres made on June 24, 1992 to Christine Raulapaugh:
 
 
 133
 Bonnie had told them--Christine Raulapaugh that her source was out of town in Chicago picking up two to three kilos of cocaine and would be returning later. The source was identified as Yolanda Reyes.
 
 
 134
 J.A. at 733.
 
 
 135
 The trial judge concluded that the "$17,000 of which both Ms. Reyes and Mr. Santoyo jointly were in possession was designed to be traded for four kilograms of cocaine" J.A. at 743, and that "logic simply dictates that this New York business was exactly parallel to the Chicago business and was--all of it was supporting the local cocaine business in Saginaw." J.A. at 744. The judge then had no difficulty in finding that the charged conspiracy involved more than five kilograms of cocaine. J.A. at 748. The judge found the total offense level to be 37. This presumably resulted from a base level of 32 (5 to 15 kilograms of cocaine) plus 4 levels for his leadership role in the offense but increased to 37 as a result of the defendant having had two prior felony drug convictions and being classified as a career offender under U.S.S.G. Sec. 4B1.1. Although his criminal history placed him in Category IV, his career offender status placed him in Category VI. The imprisonment range was 360 months to life, but because the amount exceeded five kilograms and defendant had two prior drug convictions, 21 U.S.C. Sec. 841(b)(1)(A) required a mandatory term of life imprisonment without release.
 
 
 136
 On Count 1, the conspiracy count, the judge sentenced defendant to a term of life imprisonment. On Count 10 (the possession with intent to distribute count based on the February 11, 1992 transaction with the Plaskewiczs); Count 12 (the possession with intent to distribute count based on the May 19, 1992 transaction between the Torreses and Norman Wilson); and Count 14 (the possession with intent to distribute count based on the July 7, 1992 transaction between Reyes and Jose Gonzalez) the defendant was sentenced to concurrent terms of thirty years on each count. In addition to a life sentence, defendant was also placed on supervised release for twenty years.[3]
 
 
 137
 The importance of including kilogram amounts in the computations is obvious. If the sentence had been based only on the amounts of cocaine actually involved in all of the drug transactions in question, including even the estimated amounts "witnessed" or "observed," the total was less than 300 grams. Defendant's offense level would have been 24 (base level of 20 plus 4 levels for his role in the offense). With a Category IV criminal history, the imprisonment range would be 77-96 months. Because of defendant's career criminal status, however, his offense level under section 4B1.1 would be 34 and he would be in a Category VI criminal history with an imprisonment range of 262-327 months.[4] As a practical matter, given the defendant's age (43) at the time of his sentence, the difference between a sentence of approximately twenty-one years and one of life imprisonment may not appear to be great, but the difference between a determinate sentence, with reduction for good time credits, and a sentence of life imprisonment without release is of enormous importance to the defendant.
 
 
 138
 I believe it was error to include the kilogram amounts in the sentencing calculations for the following reasons.
 
 
 139
 The four kilograms of cocaine were included solely because of the testimony of Detective McMahan at the sentencing hearing. It was not included by the probation officer because, consistent with the position taken by the government at trial and stated by the government on the record, this was not a part of the conspiracy charged in the indictment. Furthermore, the government apparently did not object to the probation officer's exclusion of this amount prior to or even at the sentencing hearing itself. Also, McMahan's testimony that the New York conspiracy involved four kilograms of cocaine was based solely on what some unidentified agent in New York told him in a telephone conversation. Finally, it was undisputed that charges that Santoyo had been involved in the New York conspiracy had been dropped. Under these circumstances, I do not believe that it can reasonably be held that the government established by a preponderance of the evidence that Santoyo was in fact a member of an alleged New York conspiracy, that this other conspiracy was to distribute four kilograms of cocaine; and that he should be charged with four kilograms of cocaine in the Saginaw conspiracy for which he was convicted.
 
 
 140
 The trial court also considered the testimony of McMahan regarding "two to three" kilograms which were the subject of an alleged statement by defendant Bonnie Torres to Christine Rulapaugh on June 24, 1992. Unlike McMahan's testimony regarding the alleged four kilogram New York conspiracy, his testimony concerning "two to three" additional kilograms is a reflection--although not completely accurate--of the testimony of Christine Rulapaugh during the trial.
 
 
 141
 The initial problem is to determine exactly what Bonnie Torres allegedly told Christine Rulapaugh. According to Rulapaugh's trial testimony, Bonnie told her she was waiting for Santoyo and Reyes to return from Chicago where "they were going to pick up three keys." J.A. at 438. According to McMahan's testimony at the sentencing hearing, Bonnie told Rulapaugh that her source was in Chicago picking up "two to three" kilos of cocaine and the source was Reyes. J.A. at 733.
 
 
 142
 The problem of inconsistencies in describing what Bonnie said to Rulapaugh are compounded by the hearsay nature of the testimony. Rulapaugh's testimony is based on what some unidentified person allegedly said to Bonnie and what Bonnie, in turn, allegedly said to Rulapaugh about that statement. McMahan's testimony adds another layer of hearsay--the third--by his description of what Rulapaugh told him that Bonnie told her that some unknown person told Bonnie.
 
 
 143
 The majority opinion in United States v. Silverman, 976 F.2d 1502 (6th Cir.1992), stands for the proposition that a sentencing judge may consider hearsay--even from unidentified sources--if it has sufficient indicia of reliability to support its probable accuracy as a matter of due process protection. In the Silverman case, the court considered the statement of a confidential informant concerning a prior drug transaction by the defendant and the informant, which statement was corroborated by not only another person involved in that transaction but also by the defendant's own statement to the probation officer. Unlike Silverman, the confidential informant in the present case testified about a drug transaction in which she was not involved; her hearsay statement was based on another hearsay statement from an unknown person; and her statement was not corroborated by the testimony or statement of any other person. To the extent it could be argued that Rulapaugh's statement was corroborated by her own testimony that she was later able to obtain cocaine from Bonnie after Bonnie's statement regarding the Chicago trip, this, in my opinion, is not sufficient to charge Santoyo with three kilograms of cocaine. The testimony was in conflict in two critical respects, the amount involved and the defendant involved. As to the amount, according to Rulapaugh's testimony, it was three kilograms; according to McMahan's testimony, it was "two to three" kilograms.[5] As to the source, according to Rulapaugh's testimony, it was Santoyo and Reyes; according to McMahan's testimony, it was Reyes alone.
 
 
 144
 In a matter as vitally important as determining the amount of cocaine that is chargeable to a defendant as relevant conduct, the hearsay evidence regarding the alleged Chicago trip is so attenuated and conflicting that it falls far short of having that "sufficient indicia of reliability to support its probable accuracy," Silverman, 976 F.2d at 1513, and the sentencing court, in my view, should not have included it in aggregating the amounts of cocaine chargeable to the defendant.
 
 
 145
 Although the sentencing court did not refer to the two kilograms included in the probation officer's calculations based upon Wilson's October 21, 1991 $40.00 transaction with Bonnie, I believe that for basically the same reasons given above, this amount also should not be included in the determination of relevant conduct. According to the PSR, a confidential informant (Wilson) purchased .2 of a gram from Bonnie Torres on October 21, 1991. In his debriefing he told McMahan that Bonnie had said "that 'Gramps' and the 'old folks' from the 'east side' of town were their, the Torreses', source of cocaine" and that "said source had recently obtained two kilograms of cocaine from Florida." J.A. at 217. Wilson's testimony at the trial, however, conflicted with this version of what Bonnie had said. According to his trial testimony, Bonnie "said that there was more cocaine coming into town that night, and if I needed anymore that it was supposed to be coming in, two kilos, from a person, old man Jackson." J.A. at 323. Hearsay infirmities aside, the conflicts between what Wilson told McMahan Bonnie said and what Wilson at trial told the court and jury what Bonnie said are glaring. Furthermore, the references to "Old man Jackson" on the one hand and "Gramps and the old folks" on the other hand result in sheer speculation not only as to what was actually said by Bonnie but as to the connection, if any, with the defendant.[6] This hardly rises to the standard of reliability needed to include the two kilograms of cocaine as relevant conduct.
 
 
 146
 While I recognize that a district court's factual findings regarding the amount of narcotics for which a defendant is to be held accountable are accepted by this Court unless clearly erroneous, United States v. Okayfor, 996 F.2d 116 at 120 (6th Cir.1993), this standard still requires a careful review of the calculations made by the district court and the evidence upon which those calculations are based. For the reasons stated, the evidence of the four, three and two kilogram amounts does not rise to the level of reliability required by the guidelines and due process requirements and should have been excluded. The failure to exclude them, in my view, was clearly erroneous and resulted in a sentence of life imprisonment without release.
 
 BONNIE TORRES' SENTENCE
 
 147
 The evidence clearly established that Bonnie Torres was a street level retailer of small amounts of cocaine. Even by using confidential informants to make repeated purchases from Bonnie (8 by Wilson and 3 by Rulapaugh) over a long period of time (from October 1991 to June 1992), the combined sales totaled less than 50 grams of cocaine.[7] Even if all drug sales by all co-conspirators are included, together with estimated amounts "witnessed" by confidential informants and amounts seized in the searches, the total is still less than 300 grams. With an offense level of 20 and a criminal history Category of I, the imprisonment range would be 33-41 months. Primarily as a result of including the three kilograms and two kilograms discussed above, the probation officer held her accountable for 5.2 kilograms of cocaine, with an offense level of 32 and an imprisonment range of 121-151 months. Because of the 5.2 kilogram amount and the fact that she had one prior drug conviction, the statute, 21 U.S.C. Sec. 841(b)(1)(A), required a mandatory minimum of twenty years and a maximum of life imprisonment on the conspiracy count.
 
 
 148
 No witness testified at the sentencing hearing. The court referred to the PSR and the informants' statements regarding Bonnie's references to the three Chicago kilograms and the other two kilograms. The court said that these "discussion amounts" alone were enough to reach the critical five kilogram amount:
 
 
 149
 Those discussion amounts alone, because the Court finds them rational, the Court finds certainly from the evidence that the defendant had every, every ability to acquire and to dispense those kinds of amounts.
 
 
 150
 J.A. at 713.
 
 
 151
 There was absolutely no evidence, however, that Bonnie Torres, a street-level dealer whose customers bought small amounts of cocaine, usually for $20.00 or $40.00, had the ability to acquire or to sell kilogram amounts of cocaine. More importantly, the Court's conclusion that Bonnie should be charged with an amount in excess of five kilograms was based on the testimony of the confidential informants, Wilson and Rulapaugh, regarding the three Chicago kilograms and the other two kilograms allegedly mentioned by Bonnie in conversations with them. The government attorney also suggested that the Court could "throw into the pool" the four kilograms allegedly involved in the New York conspiracy. J.A. at 719. For the reasons set forth above in the discussion of Santoyo's sentence, I believe the evidence regarding these alleged statements of Bonnie Torres does not rise to the level of reliability required by the guidelines and due process requirements and, therefore, should have been excluded. The appropriate sentence for this small-time, street-level dealer would be one in the range of 33-41 months, not the sentence of twenty years imprisonment imposed by the district court.
 
 CARL BRYAN'S SENTENCE
 
 152
 Carl Bryan, the brother of Bonnie Torres, occupied an entirely different position in the conspiracy than the other defendants. A cocaine user himself, he assisted the Torreses in some, but not all, of the small sales made by the Torreses to the confidential informants. There was no evidence that he had any contact whatever with Santoyo or Reyes or that he had any knowledge of the kilogram amounts that were allegedly referred to by Bonnie in statements made to the confidential informants. The probation officer nonetheless included these five kilogram amounts on the ground that "there is reason to believe that due to his closeness with the Torreses and his involvement, he would have had reasonable knowledge concerning the full scope of the offense per Relevant Conduct. 1B1.3." J.A. at 272. Based on this amount which is an offense level 32, and the defendant having 0 criminal history points, the imprisonment range was 121-151 months on the conspiracy charge. There being five kilograms of cocaine charged to the defendant, he faced a statutory minimum of ten years. 21 U.S.C. Sec. 841(b)(1)(A). The court sentenced Bryan to a term of 121 months on each count, all terms to run concurrently to each other. I believe this sentence was erroneously imposed for the following reasons.
 
 
 153
 First, for the reasons previously stated, the court erroneously included the five kilograms which, in Bryan's case, were based on hearsay statements allegedly made by his sister to the confidential informants. If these amounts are excluded, as they should have been, the total of all cocaine in question, according to the probation officer's "Drug Summary Chart" would be .26 kilograms or 260 grams. This would have resulted in a base offense level of 20 which, with a criminal history category of I, would have imposed a sentence of 33-41 months--a sentence far more appropriate in light of Bryan's limited involvement in the conspiracy.
 
 
 154
 Second, there was insufficient evidence to establish that Bryan could reasonably foresee that co-conspirators were engaged in any conduct involving multiple kilograms of cocaine. At the sentencing hearing Bryan's counsel argued that, while Bryan could be charged with the cocaine distributed from the Torres house, he should not be charged with other amounts which he could not reasonably foresee were involved. J.A. at 634-35. The government attorney argued that because Bryan spent a lot of time in the Torres house and assisted in selling drugs from the house, he could have reasonably foreseen "that there would be some quantity of drugs that was found basically associated with the suppliers of the drugs that he was selling through the house that he spent a lot of time in." J.A. at 636; emphasis supplied. The court's ruling on the issue of foreseeability is, to say the least, confusing. After speculating that if Bonnie Torres told Rulapaugh her source had gone to Chicago to pick up three kilograms, Bonnie probably told her brother the same thing, J.A. at 640, the court then ruled on the issue of foreseeability as follows:
 
 
 155
 Mr. Dunn, I find, by a preponderance of the evidence, he was aware of the source of this cocaine from Mackie Santoyo and Yolanda and he is, therefore, responsible, within a rational understanding of the phrase reasonable foreseeability, for the drug amount quantities found in this time frame at the Santoyo or under the control of the Santoyo and Reyes household.
 
 
 156
 I think it would be equally unreasonable to extend his reasonable foreseeability backwards toward the multiple kilograms that were no doubt in the possession of or distributed by the people in Chicago or whoever it was that Santoyo got his material from. I don't think that was reasonably foreseeable to Mr. Bryan, but certainly these relatively modest amounts that were attributed, and I think very conservatively so, to the Santoyo and Reyes household are going to be ultimately his responsibility.
 
 
 157
 J.A. at 640-641; emphasis added.
 
 
 158
 Whether the court intended to exclude the three Chicago kilograms that were mentioned in Bonnie's alleged statement to Rulapaugh (and, similarly, the two kilograms mentioned in Bonnie's alleged statement to Wilson), is therefore not clear. What is clear is that there was absolutely no evidence that Bryan was aware of these statements or any evidence that he could reasonably foresee that the conspiracy involved multiple kilograms of cocaine. Even assuming, as the government argued, that he could have foreseen "some quantity of drugs," this falls far short of the requirement that he could have reasonably foreseen that Santoyo and Reyes were dealing in multiple kilogram amounts of cocaine and he therefore should be held accountable for these very large amounts. United States v. Moss, 9 F.3d 543, 552-553 (6th Cir.1993).[8]
 
 
 159
 Third, to attribute five kilograms of cocaine to Bryan, the evidence would have to establish that he not only could have reasonably foreseen that Santoyo and Reyes were involved in multiple kilogram amounts of cocaine, but that their conduct was in furtherance of the limited criminal activity Bryan agreed to undertake with his sister. U.S.S.G. Sec. 1B1.3(a)(1)(B).
 
 
 160
 In the case of a jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:
 
 
 161
 (i) In furtherance of the jointly undertaken criminal activity; and
 
 
 162
 (ii) reasonably foreseeable in connection with that criminal activity.
 
 
 163
 Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement). The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision. The conduct of others that was not in furtherance of the criminal activity jointly undertaken by the defendant, or was not reasonably foreseeable in connection with that criminal activity, is not relevant conduct under this provision.
 
 
 164
 In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others.
 
 
 165
 U.S.S.G. Sec. 1B1.3 Commentary, Note 2.
 
 
 166
 In the present case, it is clear that the scope of the criminal activity jointly undertaken by Bryan with his sister is not the same as the scope of the entire conspiracy. Bryan's agreement, implicit from the evidence, was to assist his sister in the sale of cocaine from her residence. He is accountable, therefore, for all amounts distributed in furtherance of this jointly undertaken activity, but not for the much larger kilograms of cocaine that Santoyo and Reyes allegedly possessed.
 
 
 167
 Illustration (c)(7) in the above Commentary is instructive:
 
 
 168
 Defendant R recruits Defendant S to distribute 500 grams of cocaine. Defendant S knows that Defendant R is the prime figure in a conspiracy involved in importing much larger quantities of cocaine. As long as Defendant S's agreement and conduct is limited to distribution of the 500 grams, Defendant S is accountable only for that 500 gram amount (under subsection (a)(1)(A)), rather than the much larger quantity imported by Defendant R.
 
 
 169
 Similarly, Bonnie Torres recruited her brother to assist her in the distribution of cocaine from her house. Even if it is assumed that Bryan was aware that Bonnie was a prime figure in a conspiracy and that her supplier possessed at various times kilogram amounts of cocaine, as long as Bryan's agreement and conduct was limited to assisting his sister in distributing relatively small amounts of cocaine from her house, he should not be held accountable for the much larger quantities allegedly possessed at different times by Santoyo and Reyes. A broadly cast conspiracy net, as in this case, often catches minnows as well as game fish, but both the guidelines and fundamental due process require that they be treated differently in determining the punishment to be imposed.
 
 
 170
 If all of the distributions from Bonnie's house are considered, and even if the estimated amounts "witnessed" by confidential informants are included, the total is less than 300 grams of cocaine with an imprisonment range of 33-41 months. A sentence in that range would comply with the guidelines and statute and would be consistent with the limited criminal activity of the defendant in this case.
 
 CONCLUSION
 
 171
 For the above reasons, I concur in the affirmance of the defendants' convictions, but I would reverse the judgments of the sentences imposed on Michael Santoyo, Bonnie Torres and Carl Bryan and would remand this case to the district court for resentencing of those defendants.[9]
 
 
 
 *
 The Honorable John D. Holschuh, Chief United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Detective McMahan testified at the sentencing hearing that four kilograms of cocaine had been seized. J.A. at 734
 
 
 [1]
 Local Rule 232.1 of the United States District Court for the Eastern Division of Michigan requires the parties to submit written objections to the PSR
 
 
 [2]
 In the government's brief on this appeal, the statement is made:
 The presentence report listed various drug quantities that were applicable to the defendant (Santoyo) (PSR at p. 10-11). The quantities included were the drug quantities associated with the purchases made by the informants or the undercover officer, the drug quantities associated with the New York trip and quantities that were based on statements of co-conspirators.
 Government brief, p. 39.
 The government's statement is not correct. The quantities listed in the PSR did not include "the drug quantities associated with the New York trip." See addendum hereto.
 
 
 [3]
 The Assistant United States Attorney was of the opinion that, with a life sentence, "it would not seem to make any sense to impose supervised release period of time." J.A. at 756
 
 
 [4]
 The circuit courts are sharply divided on the question of whether a drug conspiracy conviction can be included as one of the predicate offenses to establish a career offender status under U.S.S.G. Sec. 4B.1. Cf. United States v. Price, 990 F.2d 1367 (D.C.Cir.1993); United States v. Mendoza-Figueroa, No. 93-2867 (8th Cir. June 27, 1994) and United States v. Bellazerius, No. 93-3157 (5th Cir. June 17, 1994), holding that conspiracy conviction cannot be included, with United States v. Heim, 15 F.3d 890 (9th Cir.1994); United States v. Damerville, No. 93-3235 (7th Cir. June 14, 1994), and United States v. Hightower, No. 93-5117 (3d Cir. May 31, 1994), holding that conspiracy conviction can be included. This issue has not been raised in this case by Santoyo, but I believe it is an issue that the district court should consider if the case were remanded for resentencing
 
 
 [5]
 The amount involved is extremely important. If the four kilograms attributed to the New York conspiracy are excluded and the alleged Chicago trip involved less than three kilograms, the total that could be chargeable to Santoyo would be under the critical amount of five kilograms
 
 
 [6]
 The government states in its brief that "The 'old man' was a name associated with the defendant Michael Santoyo. (Dennis McMahan, February 2, 1993 Trial Tr. at 21)." Government's brief, p. 39. The reference is to McMahan's testimony regarding a transaction involving McMahan, another confidential informant, David Nichols, and defendant Ed Plaskewicz on February 11, 1992. According to McMahan's testimony, the three went to the residence of Abby Goosman to buy cocaine but Plaskewicz, after talking to Goosman, told McMahan that "he was out of cocaine, he was going to send me to the old man's house over on the south side." Following this conversation, they drove to Santoyo's house on Washington Street. It is on this slim reed that the government attempts to identify the "Old Man Jackson" referred to by Wilson as being Michael Santoyo
 
 
 [7]
 This does not include cocaine allegedly seen in the Torres house and estimated as to amount by the confidential informant
 
 
 [8]
 Defendant Edward Plaskewicz was also found guilty on Count 1, the conspiracy count as well as Count 10, a substantive count involving the distribution of 1.05 grams of cocaine on February 11, 1992. Government counsel contended that relevant conduct included additional amounts from other sales and offers to sell to the confidential informant, Dave Nichols, totaling 33 to 34 grams. With reference to inclusion of two kilograms as had been "suggested on the government's worksheet at some time or other" (J.A. at 660), the government attorney responded:
 I don't know how that calculation was made, your Honor. I do believe that certainly given the modification of sentencing guidelines that were effective November 1st and as a result of that difference in the view to some degree of the drug quantity that individuals are accountable for, I believe that this (33 to 34 grams) would be an appropriate figure and a higher figure, perhaps, could not be defended on the record of this case.
 J.A. at 661.
 Although the government attorney's reasoning for not including the multi-kilogram amounts as relevant conduct in Plaskewicz's conspiracy conviction is not further amplified on the record, presumably he had concluded that these multiple kilogram amounts were not reasonably foreseeable by Plaskewicz. If so, the same would be true of Bryan who, unlike Plaskewicz, had never had any contact with Santoyo and whose only activity involved assisting his sister in sales made by the Torreses.
 
 
 [9]
 Defendant Yolanda Reyes, who was found by the sentencing court to have an offense level of 35, a criminal history category of II with an imprisonment range of 188-235 months, J.A. at 177, was sentenced to a term of 235 months. She has not appealed her sentence